**In re BEST PRODUCTS CO., INC., et al., Debtors.**

**Bankruptcy No. 91 B 10048 (TLB).**

United States Bankruptcy Court, S.D. New York.

May 25, 1994.

38

Weil, Gotshal & Manges by Harvey Miller, Kenneth Steinthal, Lori Fife, Kevin Barrett and Judith Siegel, Orans, Elsen & Lupert by Sheldon Elsen, Robert Plotz and Melissa Cohen, New York City, for debtors.

Simpson Thatcher & Bartlett by Melvin Cantor, Lillian Kraemer, Robert Bourque and Mary Beth Forshaw, New York City, for Bank Group.

Wachtell Lipton Rosen & Katz by Chaim Fortgang and Eric Roth, New York City, for Chemical Bank.

Kronish, Lieb, Weiner & Hellman by Richard Lieb, Robert Feinstein, Tara Hannon and Sara Krauss, New York City, for Resolution Trust Corp.

Milbank, Tweed, Hadley & McCloy by Stephen Blauner and Susanne Toes, New York City, for Rockefeller Group Capital Corp. and Royal Hawaiian Shopping Center.

Resolution Trust Corp., As Receiver, Complex Litigation Section by Joseph Guzinski and Joseph Patchan, Washington, DC.

Brown & Wood by James Yellen and Charles Klink, New York City, for First Fidelity Bank.

Stroock & Stroock & Lavan by Lawrence Handelsman and David Botter, New York City, for Creditors' Committee.

Latham & Watkins by Robert Rosenberg and James Brandt, New York City, for Metropolitan Life Ins. Co.

Kirkland & Ellis by James Gale, New York City, for Adler & Shaykin.

Seward & Kissel by Catherine Kortlandt, New York City, for Mut. Life of New York.

McGuire, Kehl & Nealon by Arthur Nealon, New York City, for Kellner DiLeo and Alpine Associates.

Whitman Breed Abbott & Morgan by Norman Kinel, New York City, for Principal Mut. Life Ins. Co.

## OPINION ON CONFIRMATION OF DEBTORS' JOINT PLAN OF REORGANIZATION AND APPROVAL OF RELATED COMPROMISES AND SETTLEMENTS

TINA L. BROZMAN, Bankruptcy Judge.

Best Products, Inc. and its affiliates (whom I will refer to together as "Best"), seek to confirm a joint plan of reorganization which has garnered the overwhelming support of all its creditor classes except for those ("Objectants") which hold claims that are contractually subordinated to the claims of Best's lenders. Best's chapter 11 petition was filed in the wake of a failed leveraged buyout ("LBO") which was commenced in late 1988 and consummated in early 1989. Best's plan embodies, among other things, settlements of adversary proceedings which it brought in December, 1992, against various LBO constituencies seeking to unwind the LBO under state fraudulent conveyance doctrines imported into federal bankruptcy law (the "LBO Action") and seeking to recover certain preferences. The plan represents the product of extended negotiations among Best, the banks who participated in the LBO and hold its senior debt ("the Banks"), the creditors' committee (on which the subordinated creditors are represented), two of the three Objectants and purchasers of a substantial amount of trade claims. The Objectants oppose confirmation of the plan on various grounds, foremost of which is that the proposed settlement with the Banks, who are defendants in the LBO Action, is unrea-

sonable and lacking in good faith. The Resolution Trust Corporation ("RTC")[1] also asserts that I am unable to confirm this plan until I resolve a pending adversary proceeding which it recently commenced against the Banks seeking to invalidate the subordination agreement which renders its claims junior to those of the Banks. Much like the RTC, certain subordinated creditors led by Rockefeller Group Capital Corporation (the "Rockefeller Group") contend that I must resolve their cross-claims in the LBO Action before I may consider confirmation of the plan.

### I.

#### A. Background

Best is in the business of operating catalog showrooms in twenty-two states located primarily in the Mid–Atlantic states and portions of the Midwest, the Northwest and the Southwest. Debtors' Exh. 175 at 12–13. In addition, Best operates a nationwide mail-order service as well as a chain of jewelry and giftware stores in seven states. Best's targeted market niche is the discount sale of jewelry, housewares, electronics and other brand-name merchandise. With roughly 160 or so showrooms[2], Best ranks as one of the nation's largest catalog showroom retailers.

Notwithstanding its current prominence, Best started out in 1956 in Richmond, Virginia, as a family-run, mail-order company that sold merchandise utilizing a published catalog. The catalog showrooms evolved some years later from a decision to include merchandise displays in the mail-order offices. It is in the showroom segment of its business that Best has experienced explosive growth. As a point of reference, in 1969, when it first became a public company, Best operated five showrooms along with its mail-order business; from then on, Best grew its showroom base both by acquisition and internal expansion. In 1982, Best nearly doubled in size when it acquired the catalog showroom businesses of Basco, Inc. and Modern Merchan-

---

**1.** The RTC appears in this case as receiver for FarWest Savings & Loan Association ("FarWest") and ABQ Federal Savings Bank ("ABQ"), two of the participants in the failed LBO.

**2.** Each showroom has a large warehouse where items are stocked and delivered to customers after they have inspected display samples. RTC Exh. 28.

dising, Inc. Debtors' Exh. 159 at 16. During the early 1980s, Best also expanded the scope of its operations by purchasing Ashby's, Ltd., a specialty women's shop, and by starting a specialty retail jewelry chain known as Best Jewelry.

Not surprisingly in the face of a phenomenal and uninterrupted growth spurt, Best experienced operational setbacks in the mid–1980s which forced the company to retrench. In 1985, Best began what ended up being a three-year restructuring program as part of which Best disposed of seventeen of its unprofitable showrooms as well as the business of Ashby's Ltd. Debtors' Exh. 224 at F–15. In addition, Best renovated nearly half of its existing showrooms. It also streamlined and improved its operations by centralizing many of its staff functions and upgrading its cash register/inventory management systems (often referred to as point of sale terminals). By the end of 1987, Best had slimmed down to 194 catalog showrooms in twenty-seven states and thirty-five jewelry stores in eight states and in the District of Columbia.

As is the hope after implementation of a restructuring program, Best's financial performance soared. For example, Best's income before interest, taxes and restructuring charges increased from $47.3 million in fiscal year ("FY") 1985 to $63.5 million in FY1986 to $100.8 million in FY1987. This performance was aided in large part by an increase in the company's gross margin over the same period from 24.59% in FY1985 to 25.63% in FY1986 and to 27.43% in FY1987. Debtors' Exh. 159 at 13.

B. *The Company In Play*

Outside investors took notice of the company's improved operating performance and started accumulating large blocks of Best's common stock.[3] By February, 1988, two entities had filed schedules with the Securities and Exchange Commission indicating that each was the beneficial owner of over 7% of the common shares of Best. By August of

that year, a third entity reported that it owned nearly 10% of Best's common stock. In response to the mounting interest in the company, Best's board of directors appointed a special committee, which retained financial advisors and legal counsel, to evaluate the company's options and recommend to the board the strategy which would best promote the interests of the company and its stockholders. Debtors' Exh. 9 at 6. At least five investment firms communicated to the special committee an interest in the company. In late September, the special committee rejected one proposal which offered to pay common stockholders $21 per share. RTC Exh. 28. When the dust settled, Adler & Shaykin ("A & S") was declared the highest bidder at a price of $27.50 per share, a sum well above the average of the other bids considered. Tr. at 664, 1007. The board subsequently approved the A & S offer. Debtors' Exh. 24.

In making the winning bid, A & S relied on a financial analysis entitled "Project Jewel." Debtors' Exh. 198. The record establishes that Project Jewel derived its numbers from a report which was originally prepared by Best's management as part of its five year strategic planning process. In other words, this report was not generated to support the sale of the company. Project Jewel assumed: annual sales growth of 3.5%; a 1.7% increase in gross margins (from 27.5% in fiscal year 1988 to 29.2% in fiscal year 1991 and each year thereafter); an improvement in Best's inventory turn ratio from 2.4 times to 2.5 times in 1990 and 3.1 times in 1991 (and each year thereafter); and a capital budget of $15 million for two years, $20 million for one year and, for each succeeding year, a sum which exceeded the prior year's budget by 4%. Debtors' Exh. 198.

With the benefit of hindsight, it is apparent that the projections underlying Project Jewel, which A & S considered its "base case," were overly optimistic.[4] Indeed, Ar-

---

**3.** As a result of this activity, the price of Best's common stock, which closed the FY1987 at $8.75, increased to $13.75 by the end of July, 1988, and reached $16 over the course of the summer. Debtors Exh. 197 at 1–5.

**4.** For example, sales were projected to increase by 3.5% but actually increased by roughly one percent in FY1988, stayed flat in FY1989 and declined by roughly 12% in FY1990 (the last month of which Best was a debtor-in-possession). Similarly, Best's gross margin over the period

thur Young (who was retained by A & S to conduct due diligence in connection with the LBO) memorialized some concerns as early as October 5, 1988 that the assumptions in the A & S base case represented "a favorable case and not the most probable case scenario."[5] RTC Exh. 73; Tr. at 1380. On the other hand, the record made in support of the compromises and the plan establishes that senior management of Best believed the projections were reasonable at the time. Debtors' Exh. 188 at 35, 39 [6]. The financial expert, Arthur Newman, retained by one of the Banks, also testified that the projections were reasonable in light of the operational improvements achieved from the restructuring.[7] Tr. at 1551, 1564, 1567. The asserted deficiencies in A & S's due diligence serve as one foundation for the Objectants' argument that Best could easily prove the LBO constituted a fraudulent conveyance.[8]

### C. *The Tender Offer & Merger Financing.*

After the Board approved its bid at the October 7th board meeting, A & S set into motion a two-part plan to complete the LBO. In the first phase of the transaction, A & S formed two new entities, BAC Acquisition, Inc. ("BAC Acquisition") and BAC Holdings Corp., to make a public tender offer for the outstanding Best common shares. Tr. at 54. To finance the tender offer, BAC Acquisition raised $589 million in short-term financing from a group of banks, as well as $90 million in short-term subordinated financing from a syndicate of lenders led by Equitable Deal Flow Fund, L.P. (the "Equitable Group"). *Tr.* at 54. In addition, BAC Holdings Group, Inc. infused $50 million in equity. Tr. at 54. Armed with this war chest, BAC Acquisition successfully completed the tender offer with nearly 97% of the stock being tendered. Tr. at 54.

That accomplished, A & S moved on to the second phase of the transaction, a merger of Best and BAC Acquisition. As part of the merger, which closed on March 3, 1989 (the "merger date"), new financing was arranged to retire the tender offer debt and some pre-LBO subordinated notes ("the 12⅝% notes") as well as to provide working capital for the company's needs in 1989. Tr. at 55–57.

The cornerstone of the merger financing was a $622 million commitment of partially secured [9] but largely unsecured loans provid-

---

went from 27.3% in FY1988 to 27% in FY1989 to 25% in FY1990. *See* Debtors' Exh. 225 at 2; Debtors' Exh. 226 at 3; Tr. at 1820.

5. In its summary of a meeting held on October 4, 1988, two members of the Arthur Young team engaged to conduct due diligence questioned, *inter alia*, the sales growth and margin assumptions that were ultimately adopted by A & S. *See* RTC Exh. 73 at 2. At trial, Ira Zecher, a member of the Arthur Young team, testified that representatives of A & S discounted their concerns as being "business issues," believing instead "that the new management [would be] able to implement the business processes to meet these projections." Tr. at 1406.

6. The two objections interposed by debtors' counsel as to the form of the question are overruled.

7. With a few exceptions, I found Mr. Newman's testimony to be credible and persuasive. Mr. Newman was retained in January, 1992, shortly before the retention of an examiner and one year in advance of the commencement of the litigation, to "do an intensive review of the facts and circumstances that existed at the time of the Best LBO with a view toward determining a ... professional opinion on whether the transaction was a fraudulent conveyance." Tr. at 1539. This difference in outlook, so to speak, distinguishes him from the other experts, who were hired for the express purpose of testifying as a witness at this hearing.

I make the comment about Mr. Newman's testimony not to explain findings of fact, as I might have done had I been trying the LBO action, but to indicate the relative strengths and weaknesses of the cases which could be presented by the parties to the LBO Action.

8. The Objectants also accuse the Banks of having conducted inadequate due diligence in support of their commitment to extend the $622 million merger financing. The due diligence was conducted by a team of six LBO specialists and another six to ten specialists from other disciplines. Tr. at 1315–17. The period of due diligence was short, about six days, but was intensive. In addition to the due diligence performed by in-house staff at Manufacturers' Hanover Trust Co. (which was the lead bank), due diligence was performed at that bank's behest by Arthur Young. Tr. at 1190.

9. The funds advanced by the Banks were secured by pledges of the stock of Best and its subsidiaries, as well as liens on general intangibles and specific fixtures of Best and its subsidiaries. *See* Debtors' Exhs. 25, 35; Tr. at 58.

**42**

ed by a syndicate of banks led by Manufacturers Hanover Trust Co ("MHT").[10] The $622 million bank financing was raised in three pieces: a $325 million term note ("Term Note"), a $122 million real estate bridge note ("Real Estate Bridge Note"), and a $175 million credit facility consisting of a $125 million revolving credit facility ("Revolving Credit Facility") and a $50 million working capital facility ("Working Capital Facility"). Tr. at 55. A & S also obtained commitments for: $175 million [11] of senior subordinated notes [12] ("RGCC Note Purchase Agreement") provided by a syndicate of lenders led by the Rockefeller Group Capital Corporation [13] ("Rockefeller Syndicate") and $75 million in junior subordinated notes provided by the Equitable Group. Lastly, another $35 million in equity was contributed by BAC Holdings (over the $50 million infused as part of the tender offer). Debtors' Exh. 36 § 1.2; Tr. at 55.

D. *Best's Decline*

It wasn't long after the merger that events started to occur which foreshadowed Best's eventual bankruptcy filing. The first of Best's problems was the declaration by First Fidelity Bank (one of the Objectants), the trustee for the 12⅝% notes, which were scheduled to mature in December 1, 1997,

that the LBO caused certain defaults under the trust indenture.[14] Debtors' Exh. 159 at 17. While this problem was brewing, Best was looking for permanent capital to replace the $122 million of Real Estate Bridge Notes which were to be refinanced within nine months of the date of the merger.[15] Debtors' Exh. 35 at §§ 1.1 & 3. In addition, the company needed changes in certain covenants of the Term Note which led Best and the Banks to renegotiate the original agreement in the spring of 1990. Tr. at 219, 1627. The last of the noteworthy problems involved the relationship with the trade creditors which began to deteriorate in early 1989 and became critical in the second half of the year, shortly before the filing of the petition. Tr. at 69.

1. *The 12⅝% Notes and the Senior Subordinated Bridge Notes*

Soon after the merger was consummated, the trustee for the 12⅝% notes (the "Indenture Trustee") advised Best that the LBO caused certain defaults under the trust indenture. Although Best disputed the Trustee's assessment, the company forestalled a potential problem by redeeming $128 million of the 12⅝% notes at 103.6% of par in August, 1989. Tr. at 61. After one failed tender offer, Best accomplished the redemption of

---

**10.** There was a change in some members of the bank syndicate between the tender offer and the merger financing. Tr. at 57.

**11.** Best's board authorized the company to borrow $41.5 million pursuant to the RGCC Note Purchase Agreement as part of the merger. Debtors' Exh. 29 at 8 and 38. Apparently the remaining $133.5 million was to serve as a "backstop" solution in the event other financing could not be timely arranged to redeem the 12⅝% notes.

*See* Debtors' Exh. 202.

**12.** Pursuant to the RGCC Note Purchase Agreement, the Rockefeller Syndicate agreed that payments on any notes issued to it under that agreement would be "subordinate and subject in right of payment to the prior payment in full" of the indebtedness owed to the Banks. Debtors' Exh. 36 at § 10.1.

**13.** The $175 million was provided by the following entities: Rockefeffer Group Capital Corporation ($100.75 million), FarWest (roughly $26.1 million), Amsave Credit Corporation ($15 mil-

lion), ABQ Bank (roughly $1.9 million), Trustees of the Estate of Bernice Pauahi Bishop ($26.25 million) and McDonnell Douglas Finance Corp. ($5 million). Debtors' Exhs. 40 and 55.

**14.** It should be noted that concerns about the LBO's causing potential defaults under the indenture were raised in late 1988, well before the March, 1989, closing of the merger. Debtors' Exh. 6. That is probably why, as discussed earlier, as part of the merger financing Best arranged a commitment for $133 million in short-term subordinated financing which would be tapped in the event that Best were unable to raise public funds to retire the 12⅝% notes.

**15.** On November 30, 1989, Best raised approximately $223 million in secured financing by granting mortgages on approximately forty-nine properties to Metropolitan Life Insurance Company ("MetLife"). *Tr.* at 58. Best used the proceeds of this debt to retire the $122 million in Real Estate Bridge Notes, prepay existing obligations on those specific properties and pay down nearly $70 million of the $325 million Term Note. Tr. at 58.

the 12⅝% notes [16] by issuing, pursuant to the RGCC Note Purchase Agreement, $133.5 million of Senior Subordinated Bridge Notes (due roughly five months later in January, 1990) to the Rockefeller Syndicate. Debtors' Exhs. 36 and 60. Best continued semi-annually to tender at par for the 12⅝% notes. Consequently, as of the filing of the chapter 11 petitions, only $2.4 million of the original $200 million in notes remained outstanding. Debtors' Exh. 175 at 16.

Having solved this problem, Best turned towards its next challenge, finding permanent financing in the high-yield market to retire the $133.5 million in Senior Subordinated Bridge Notes. Company officials were not concerned with the scheduled maturity date of January 31, 1990, for the agreement with the Rockefeller Syndicate had a safety net in the form of a "term out" provision which extended the maturity date to January 31, 1997, contingent upon a reputable investment house setting an interest rate which would allow the notes to trade in the public market at 104% of par.

Best contends that market, regulatory and other unforeseen forces prevented Best from timely meeting the January 31, 1990 deadline, thereby forcing Best and the Rockefeller Syndicate to extend the maturity date to July 13, 1990 (for, among other things, an additional 1.5% fee). Debtors' Exh. 207. Over the months following the extension, Best made numerous unsuccessful attempts to refinance the notes in the public markets. Tr. at 65. As the new expiration date approached, three of the senior subordinated lenders advised Best that an "inability to retire those notes would create an event of a default." Tr. at 65. On July 11, 1990, Best informed the senior subordinated lenders that it intended to exchange all of the outstanding Senior Subordinated Bridge Notes for term notes and requested that "an unaffiliated investment banker be selected for the purpose of determining the interest rate of the term notes." Debtors' Exh. 208. On July 12, 1990, Lazard Frères & Co. was chosen. Debtors' Exh. 209.

The expiration date for the notes passed uneventfully, but on July 24, 1990, FarWest sued Best for breach of contract. Debtors' Exh. 53. In exchange for Far West's voluntarily dismissing that action without prejudice, Best entered into an agreement on September 17, 1990 (less than 3 months before the filing of the chapter 11 petition) with three members of the original Rockefeller Syndicate, FarWest, McDonnell Douglas and ABQ ("The FarWest Group"), under which $33 million in Senior Subordinated Bridge Notes were converted into the equivalent amount of term notes. Debtors' Exh. 55. Pursuant to this transaction, the FarWest Group received a security interest, junior to that of the Banks, in much of Best's collateral. Debtors' Exh. 55. Contemporaneously, the remaining members of the original Rockefeller Syndicate (the "Rockefeller Group") again extended the maturity date of the Senior Subordinated Bridge Notes, this time to June, 1992, in exchange for a fee of over $2.1 million.[17] Debtors' Exh. 58. As part of this transaction, the Banks and the FarWest Group entered into an intercreditor agreement dated September 17, 1990, in which the FarWest Group reaffirmed that its debts would continue to be subordinate in right of payment to the debts of the Banks. Debtors' Exh. 56 at 10.

### 2. Decline in Bank Financing

In early 1990, while Best was trying to retire the Senior Subordinated Bridge Notes, Best requested an amendment to a number of the covenants of its bank financing. Tr. at 68. As part of the negotiation with the Banks, Best analyzed its inventory needs, forecasting that the overall bank facility exceeded Best's future requirements. Tr. at

---

16. As previously indicated in footnote 11, the RGCC Note Purchase Agreement contemplated the issuance of Senior Subordinated Notes in the event the company were unable to otherwise raise funds to retire the 12⅝% notes. That Agreement, which was initially scheduled to expire on June 30, 1989, was extended for two months at an average fee of 5% per month. See

Debtors' Exh. 202. Best drew the funds in August, 1989, and issued $133.5 million of notes which were to mature in January, 1990.

17. Best and the Banks urge that the Rockefeller Group thereby ratified, in effect, the LBO and their subordination to the Banks' debt.

68–9. This conclusion was premised on an assumption (which would prove inaccurate) that there would be a continuation of vendor credit at the then current level. Tr. at 68–69. Accordingly, in March, 1990, Best and the Banks negotiated an amendment to certain covenants of the Merger Agreement and with that reduced the Working Capital Facility from $50 million to $25 million. Tr. at 1625, 1627. The $25 million reduction came on the heels of a scheduled $15 million decrease in the Revolving Credit Facility (from $125 million to $110 million) which occurred in January, 1990, pursuant to the terms of the original agreement. Debtors' Exh. 35 § 6.3. All in all, the Banks reduced their revolving credit exposure in early 1990 by $40 million.

### 3. Trade Credit

Not long after Best analyzed its inventory needs, Best's relations with its trade vendors deteriorated. The result was more onerous credit terms and a contraction of total available trade credit. Tr. at 1648. Best attributes this deterioration to a confluence of unforeseeable factors including its inability to term out the Senior Subordinated Bridge Notes in January, 1990; the bankruptcy filing of another large retail company, Ames Department Stores, in April, 1990 (which led to jitteriness in Best's vendors, many of whom dealt with Ames Department Stores as well); FarWest's commencement of the breach of contract suit in July, 1990; and the Iraqi invasion of Kuwait in August, 1990. Tr. at 69–70. Best's lackluster operating performance in the second quarter of 1990 also exacerbated the problem with the trade vendors. Tr. at 1648. Whatever the cause may have been, with the contraction in trade credit, the company lacked sufficient working capital to purchase adequate inventory for the fall 1990 season. Tr. at 1648.

To alleviate the dire situation, Best obtained a $30 million loan in September, 1990, from the Equitable Group ("Equitable Loan") which allowed Best to address the

inventory shortages prior to the 1990 Christmas season.[18] Notwithstanding this somewhat late infusion of short-term capital, the record establishes that "approximately one out of every four customers in the critical Christmas season could not buy the products they wanted to buy from the company." Tr. at 71. Best experienced a disastrous Christmas season, posting a significant loss for the year.

### E. The Chapter 11 Petition

In the face of these operational problems, Best filed for relief under chapter 11 of the Bankruptcy Code on January 4, 1991, and has operated its business and managed its property as a debtor in possession. Soon thereafter, the United States Trustee appointed the committee of unsecured creditors. Early on, Best arranged a debtor in possession credit facility providing it with access to nearly $250 million in credit.[19]

From there, the company embarked on "an extensive review and analysis of the constituent parts of its business in the context of formulating, developing and implementing a long-range business plan and ultimately, a plan of reorganization." Debtors' Exh. 175 at 22. In September, 1991, Best delivered a business plan, later amended, to the creditors' committee which focused on changing Best's merchandising and marketing strategies and on lowering costs by improving Best's efficiency. Debtors' Exh. 175 at 22–3. Best then turned to the task of implementing its business plan. It closed forty-two catalog showrooms, twenty-three jewelry stores and its Texas central distribution center and disposed of substantially all of its real property interests in those locations. Debtors' Exh. 175 at 23. Best also expanded in certain select markets, opening nine new stores as of November, 1993. Debtors' Exh. 175 at 24.

But lurking all the time was the potential for recovery from lawsuits arising out of the LBO. Even before Best delivered its first version of the business plan, the creditors' committee began an investigation of the LBO

---

**18.** The Christmas selling season is the most important sales period for most retailers. Their annual performance often turns on the success or failure of the sales during this period.

**19.** The DIP facility has been reduced by $50 million and extended during the pendency of the Chapter 11 case. It is currently set to expire in August, 1994. Debtors' Exh. 175 at 22.

to evaluate potential causes of action. Debtors' Exh. 175 at 25. In September, 1991, the creditors' committee received a preliminary report on the LBO and appointed a subcommittee to follow up on the recommendations of the report. Debtors' Exh. 175 at 25. Because the committee was composed both of potential beneficiaries of a recovery from a failed LBO and of some of the likely defendants in an action arising from the failure, intercreditor issues arose which caused tremendous dissension on the committee. In December, 1991, the Banks and the RTC, with the approval of Best, moved for the appointment of an examiner. I granted that motion on January 7, 1992. Debtors' Exh. 175 at 25. The examiner was selected by the U.S. Trustee some weeks later and retained a law firm and an investment banking firm to serve as his financial advisor.

On July 7, 1992, the examiner filed an interim report which addressed only certain choice of law issues which were thought to be critical to the viability (and, perhaps, dispositive) of any claims arising out of the LBO. Debtors' Exh. 175 at 26. The examiner filed his final report on July 31, 1992, amending it about a week later. In that report, with the assistance of his professionals, the examiner set forth an extensive analysis, both legal and financial, of the LBO and concluded that viable LBO claims existed against many of the participants in the LBO. Debtors' Exh. 175 at 26. The examiner couched his conclusions of the probability of success against each of the prospective defendants not only in qualitative terms (i.e., reasonable, unlikely and remote) but also in quantitative terms (i.e., 40–60%, 20–40% and 0–20%, respectively). Specifically, the examiner concluded that the debtor would have a "reasonable" probability of success (defined as a 40–60%

likelihood of success) in fraudulent conveyance actions against certain former insider shareholders for the monies they received when they tendered their shares; A & S for professional fees; the Banks for principal and interest paid and the avoidance of security interests and obligations incurred; the Rockefeller Syndicate for $41.5 million of the obligations incurred[20] and the Equitable Group. The examiner also predicted that an action against any other participant in the LBO would have at best an "unlikely" (20–40%) and, more often than not, a "remote" (0–20%) likelihood of success. As will soon become clear, the numerical percentage which the examiner linked to each claim as his estimate of the likelihood of success has surfaced as the underpinning of the Objectants' conclusion that the proposed settlement with the Banks is unreasonable.

On August 13, 1992, Best's board of directors convened a special meeting to review the examiner's report and consider the company's options. At that meeting, the board elected Stewart Kasen, the President and Chief Executive Officer of Best (whose tenure at Best commenced after the LBO) to oversee the prosecution of any LBO claims. Mr. Kasen thereafter retained Orans, Elsen & Lupert as special counsel to prosecute the LBO claims.[21]

### F. The Lawsuits

#### 1. The LBO Action

On December 29, 1992, five days before the two year anniversary of the filing of the chapter 11 case,[22] the debtor commenced the LBO Action. Debtors' Exh. 175 at 30. Best named as defendants the Banks, A & S, the Equitable Group, the RTC, the Rockefeller

---

**20.** The examiner concluded that avoiding any of the $133.5 million debt incurred to retire the 12⅝% notes would be "unlikely."

**21.** This retention was based at least in part on the fact that the debtors' bankruptcy counsel, Weil, Gotshal & Manges, had represented A & S prior to the LBO.

**22.** Under section 546(a) of the Bankruptcy Code, a trustee has two years to commence an avoidance action. At the time the debtors were contemplating bringing suit, there was a divergence

of opinion as to whether the two year period applied to debtors in possession. *See Bonwit Teller, Inc. v. Jewelmasters, Inc., (In re Hooker Investments, Inc.),* 162 B.R. 426 (Bankr.S.D.N.Y. 1993). Best commenced suit when it did so as not to risk being precluded from prosecuting the fraudulent transfer and preference actions. Recently, the Second Circuit has joined three of its sister circuits and declared that the two-year limitations period also applies to debtors in possession. *See In re Century Brass Products, Inc.,* 22 F.3d 37 (2d Cir.1994).

Group, MetLife, certain shareholders who were directors of Best and who tendered more than 1,000 shares of Best ("Inside Shareholders"), and those former shareholders who were not directors and who received more than $27,500 from the LBO ("Outside Shareholders"). The complaint alleges that the LBO was undertaken in fraud of Best's creditors and pleads claims for constructive fraud. Although the complaint also mentions statutes which cover actual fraud, the complaint does not plead that the transfers were made with the intent to hinder, delay or defraud creditors. By way of relief, the complaint seeks from the various groups of defendants a combination of the following relief (where applicable): avoidance or equitable subordination of all claims for debt incurred as part of the tender offer and merger, avoidance of all liens granted, recovery of all principal and interest paid, recovery of fees and expenses incurred, and recovery of all amounts paid pursuant to the tender offer. Debtors' Exh. 91.

Nearly one month after the complaint was filed, Best moved for an order staying prosecution and defense of the LBO Action for approximately four months to allow the parties to attempt to settle the action. Debtors' Exh. 98. I granted that motion, but the parties were unable to reach a consensual resolution during the "standstill" period. Thus, at the expiration of the four months, Best geared up for litigation while it also pursued an amicable solution. Tr. at 186–87. All of the defendants except the RTC and the Rockefeller Group interposed answers denying the allegations of the complaint. The Rockefeller Group admitted that the transfers arising out of the LBO were fraudulent but denied that it knew that the LBO constituted a fraudulent transfer at the time that it occurred and asserted cross-claims against the Banks challenging the enforcement of the subordination agreement. (Other defendants have asserted cross-claims as well.) The RTC moved to dismiss the complaint for lack of subject matter jurisdiction and simultaneously moved the district court to withdraw the reference. One of the Banks moved to dismiss the complaint insofar as it purports to plead actual fraud.

After the initial responses to the complaint and the cross-claims were received, the parties engaged in extensive documentary discovery, propounded and answered interrogatories and engaged in certain motion practice. Specifically, Best moved for the certification of the Outside Stockholders as a defendant class and the Outside Stockholders, joined by many of the Inside Stockholders, moved to dismiss the complaint or for summary judgment on the grounds that the so-called "settlement payment doctrine" of section 546(e) of the Bankruptcy Code exempts the payments to them from avoidance. Neither of these motions was argued before Best reached the resolutions with the settling parties contained in the plan.

### 2. The Preference Actions.

At the time that it commenced the LBO Action, Best also brought a number of preference actions, specifically, (i) a suit against the Banks (the "Bank Preference Action") to avoid the granting of security interests in the inventory of Best purchased exclusively by means of letters of credit issued under the Merger Facility; (ii) a suit against the Equitable Group (which previously has been settled) (the "Equitable Preference Action") for the repayment of some $30.5 million pursuant to the Equitable Loan and (iii) a suit against the RTC and McDonnell Douglas (the "RTC Preference Action") to avoid the liens and security interests granted and the payment of interest to the FarWest Group in connection with the FarWest restructuring.

With respect to the Bank Preference Action, the Banks generally denied that Best was entitled to a judgment avoiding the security interests in the particular inventory involved and they asserted a defense that they gave new value to Best after the receipt of the alleged preference. As part of the overall settlement with the Banks, discussed below, this action is effectively being settled by Best's recovery in full of the claims asserted in that action against the Banks.

The RTC Preference Action stands in a somewhat different posture. As it had in the LBO Action, the RTC moved to dismiss for lack of subject matter jurisdiction and it requested the district court to withdraw the

reference. Ruling that both the district court and this court have subject matter jurisdiction, the district judge declined to withdraw the reference. The RTC Preference Action is not being resolved along with the LBO Action and the Bank Preference Action.

### G. *The Plan of Reorganization and the Settlements Which It Contains*

On September 7, 1993, Best filed its first proposed joint plan of reorganization, followed two weeks later by the accompanying disclosure statement. In this first effort, Best proposed that the subordinated creditors who are now the Objectants receive a distribution through the largesse of the senior creditors. The Banks, however, adamantly refused to entertain any plan that would give a distribution to the subordinated creditors in variance with the subordination agreements. Shot down by the Banks, Best did not abandon its efforts to arrive at an acceptable plan but continued to negotiate, hopeful of formulating a plan that would garner broad creditor support. To this end, Best prepared and filed four amended plans and disclosure statements prior to filing the latest version on February 10, 1994.[23]

As mentioned above, the settlements of the LBO Action and the Bank Preference Action are contained in the plan. If they are approved, the Banks, in exchange for the Best's agreement not to challenge their claim of roughly $322.7 million, will release liens and security interests granted in connection with the merger financing and the September, 1990, refinancing (the latter being the subject of the Bank Preference Action). In addition, the Banks have agreed to release any claims based upon guarantees made by subsidiaries of Best. Lastly, the Banks have agreed to shift to other classes distributions of roughly $23 million in cash and $8 million in equity. The Banks are not releasing or waiving the benefits of any contractual subordination held by them as against the Objectants.

With respect to MetLife, the settlement proposes to end litigation over the value of the properties which serve as collateral for the MetLife claim. Under this settlement, MetLife will be allowed a secured claim of $125 million (which is $10 million lower than it asserts it is entitled to) and an $81 million unsecured claim. In addition, MetLife has agreed to forego distributions on its unsecured claim which Best has valued in the vicinity of $10 million. Debtors' Exh. 181.

The remaining settlements are with A & S and the Inside Shareholders, who will pay Best $2 million (Debtors' Exh. 154) and $600,000 (Debtors' Exh. 155), respectively. The Banks and MetLife have agreed to reallocate their portion of the $2.6 million recovered from these defendants to other creditors.

Finally, Best will discontinue the LBO Action against all the remaining defendants, including the RTC, the Rockefeller Group, the Equitable Group and the Outside Stockholders.

With these agreements in place, Best has placed creditors into 20 classes and equity holders into three. The Objectants' disenchantment centers on the fact that the plan enforces the contractual subordinations and thus provides for no distribution to classes 15, 16 and 18, the classes housing the RTC's claims, the Rockefeller Group's claims and the 12⅝% noteholders claims. Debtors' Exh.

---

23. Best filed its first amended plan and disclosure statement on October 7, 1993. On November 18, 1993, Best filed its second amended joint plan, followed shortly by a disclosure statement. Best submitted yet a third amended plan and disclosure statement on December 9, 1993, virtually minutes before a scheduled hearing to approve the proposed disclosure statement. A lengthy contested hearing ensued at which numerous changes to the disclosure statement were offered and adopted. After all of the interposed objections were either resolved or overruled, I approved the disclosure statement. Before the solicitation package was mailed to creditors, Best reached agreement with the Equitable Group and the Banks to settle the Equitable Preference Action. (The Banks' participation was necessary because they had to agree to forego any distribution from this action.) This agreement, which eliminated a major thorn in Best's side, caused Best to file a fourth amended plan and disclosure statement on January 5, 1994. Since most of the objections to the type of plan Best was promulgating had been aired at the disclosure hearing for the previous plan, the revised disclosure statement was approved without controversy.

175 at 11. The distributions to which these classes would otherwise be entitled are being "rolled up" to the creditors in whose favor the subordination agreements run. The plan also provides for no distribution to the three equity classes and the junior subordinated noteholders. Debtors' Exh. 175 at 11–12. Claims with statutory priority and certain secured claims will be paid in full, in some instances, over time. Six classes will receive partial distributions. They are: class 4 (MetLife deficiency claim) which is being paid 27.16%, classes 6 and 11 which are being paid 46.82%, class 12 (the Bank claims) which is being paid 53.29%, and classes 13 and 14 (the general unsecured claims) which are being paid 47%.

The distributions to classes 6, 13 and 14 reflect the benefits realized by enforcement of the subordination provisions (which the Objectants oppose) as well as the proposed compromises and settlements detailed earlier. Tr. at 110. For example, assuming Best were unsuccessful in the LBO and Bank Preference Actions and there were no subordination, five of the six classes (not the Banks) and the four classes of subordinated creditors would receive a roughly 33.21% distribution and the Banks would receive an average 39.32% distribution.[24] Varying the outcome of the Bank Preference Action increases the *pari passu* recovery to 34.84% for each of the nine classes and decreases the average recovery for the Banks to 35.7%. Enforcement of the contractual subordination agreements has the effect of shifting the distributions of the four classes of subordinated creditors to classes 4, 6, 12 and 13. The net result is that, without giving effect to the LBO settlement, the four classes of subordinated lenders would receive nothing, class 14 would continue to receive a 34.84% distribution, classes 4, 6 and 13 would receive a 39.58% distribution and the Banks would receive an average distribution of 63.05%. The proposed LBO settlement allows Best to sweeten the distribution to the class 13 claimants (who hold industrial development bonds) by roughly 7.5% ($2.5 million), to the class 14 claimants (the general unsecured creditors) by over 12% ($42 million), Tr. at

127, and to class 6 by 7.24% ($36 million). The source of these added distributions, as discussed above, is MetLife, which is foregoing 12.4% of its distribution ($10 million), and the Banks, which, *inter alia*, are contributing roughly 10% of their distribution ($31.5 million).

When the votes were finally tabulated, the certification of ballots showed that an overwhelming number of creditors endorsed the proposed plan of reorganization. In fact, seven of the nine classes of creditors that were entitled to vote unanimously accepted the plan (albeit that some of those classes housed only one claimant). In class 13, 142 of the 149 ballots (95% in number) representing $142,000 of the $149,000 dollar amount (95% in dollar amount) of the class voted in favor of the plan. Similarly, in class 14, 645 of the 689 ballots (95% in number) representing roughly $260.5 million of the roughly $263 million dollar amount (99% in dollar amount) of the class voted in favor of the plan.

II.

One need only contemplate but briefly the small mountain of legal memoranda and documents submitted by the parties or the nearly two thousand pages of trial transcript taken over eight days of hearings to conclude that the issues presented here are thorny and complex. Ideally, the Banks and the Objectants would have resolved their intercreditor disputes so as not to jeopardize the substantial effort and compromise which have been offered to aid Best in completing its rehabilitation. Because that did not occur, Best, which proposes to distribute all of its reorganized equity to creditors (and accordingly has little, if any, leverage in the intercreditor dispute), has been left with no alternative but to attempt to confirm a plan of reorganization over the Objectants' hardy opposition.

The issues raised by the Objectants may be grouped into two categories: those going to whether I should approve the proposed settlement with the Banks (the Objectants do

---

**24.** Under this scenario, the Banks would receive a 100% distribution on a $29.5 million secured claim and a 33.21% distribution on a $293 million unsecured claim.

not challenge the settlements with any of the other parties) of the LBO and Bank Preference Actions; and those going to whether the plan of reorganization can and should be confirmed in the face of pending intercreditor disputes involving the contractual subordination agreements. As to the former, the Objectants ask me to find that the settlement is tainted by Best's bankruptcy counsel's involvement in the negotiations leading up to the settlement, since the same firm had represented A & S at the time of the LBO. Moreover, the Objectants urge that even if the settlement with the Banks does not fall because of the taint, the terms of that settlement are unreasonable. To arrive at this conclusion, they suggest that Best would be able to collect from the Banks on the LBO Action a recovery, net of litigation costs, which greatly exceeds the value of the proposed settlement. Were Best to prevail, the argument continues, each creditor class except the unsuccessful Banks (whom the Objectants believe would be forced to disgorge all principal and interest received and would have all their claims against the estate avoided) would recover more than what the plan provides.

As for the issues relating to confirmation, the Objectants' first line of attack is jurisdictional.[25] The RTC claims that § 212(j) of FIRREA, 12 U.S.C. § 1821(j), strips me of subject matter jurisdiction to enter an order of confirmation because, to do so, I would have to enforce the contractual subordination provision, which would abridge the position which the RTC has taken in its recently filed adversary proceeding seeking to abrogate the subordination agreement. The next argument is that even though the Objectants have asserted that I cannot confirm the plan because it improperly enforces the subordi-

nation agreements, I am unable to rule on the objections to confirmation because the intercreditor dispute is not core. Moreover, since the RTC is demanding a jury trial in its newly-filed adversary proceeding, it challenges my ability to hear the intercreditor dispute at all, the Second Circuit having determined that bankruptcy courts are not permitted to conduct jury trials in non-core proceedings. The Objectants would have me rule then that the plan cannot be confirmed without a trial of the LBO Action (since that is the predicate, in their opinion, to abrogation of the subordination agreements) and that that trial must be conducted by an Article III judge. Stated differently, they suggest that unless they agree to a plan which subordinates them, I am powerless resolve the intercreditor dispute and consider the confirmability (to coin a new word, perhaps) of the plan.

Beyond these jurisdictional issues, the RTC and the Rockefeller Group also challenge the plan's purported enforcement of contractual subordination agreements as part and parcel of the confirmation process. They suggest that I can not adjudicate what they consider a simple contract dispute[26] (interpretation and enforcement of the intercreditor agreement) within the context of confirmation; that dispute, they posit, must be resolved in an adversary proceeding (either the RTC's new one or the Rockefeller Group's cross-claims in the LBO Action). This procedural argument sounds a lot like the jurisdictional one: pursuant to the terms of the subordination agreement, a final determination has to be made that a debt is due and owing to the Banks before subordination can occur. I can only make that finding, they say, after I have determined, on the merits, whether the transfers arising out of the LBO constituted fraudulent conveyances

---

**25.** The Objectants do not assert that I lack jurisdiction to approve the settlement of the LBO Action. *See, e.g.*, Rockefeller Group Post–Hearing Mem. at 2.

**26.** I would note that both the RTC and the Rockefeller Group have forcefully asserted that they are not seeking equitable subordination of the Banks' claims. *See* Tr. at 45 ("RTC does not— has not in its separate lawsuit sought and does not seek equitable subordination of anything. It has a contract controversy ..."); Tr. at 46 ("Your Honor, again, the banks may characterize

the Rockefeller Group complaint as a complaint for equitable subordination, but I'm afraid the document speaks for itself, whether they call it equitable subordination or an elephant, it's two of the three counts are pled as contractual subordination claims under Section 510(a); not under Section 510(c).") Thus, to the extent equitable subordination of the Banks' claims would be an issue, the RTC and the Rockefeller Group have effectively waived it, not only explicitly, but also by failing to make a case in support of the theory.

such that all debts to the Banks would be avoided. Were I to find that the LBO was fraudulent, they continue, the prerequisite for subordination would evaporate. But I can only try the contract dispute, the Objectants contend, in an adversary proceeding, rather than in the context of this hearing. Thus I cannot confirm the plan unless I rewrite it to direct Best to escrow the distribution to the Banks until the intercreditor dispute is tried to its conclusion. Only the RTC suggests that I may so reformulate the plan. The Rockefeller Group agrees with the Banks that that would constitute a material modification to the plan which I am powerless to order.

All three of the Objectants argue that the plan does not comply with section 1129(a)(7) of the Bankruptcy Code, that is, the best interest of creditors test, since the plan fails to provide the Objectants with at least as much as they would receive under a chapter 7 liquidation. The RTC also urges that the plan is not confirmable since it extinguishes the right to have the notes the RTC holds treated on an equal level with the notes held by MetLife. Finally, the Indenture Trustee urges that the plan has not been proposed in good faith because the settlement with the Banks was not made in good faith.

### III.

■ Courts, as a general rule, favor compromise as compromises are "a normal part of the process of reorganization." *In re New York, New Haven and Hartford Railroad Co.*, 632 F.2d 955, 960 (2d Cir.), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y.1994). In this spirit, section 1123(b)(3)(A) of the Bankruptcy Code specifically permits a plan to provide for the settlement of any claim belonging to the debtor or the estate. But whether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same. The settlement must be "fair and equitable," *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), and be in the best interest of the estate. *In re Ionosphere Clubs, Inc.*, 156

B.R. 414, 426–27 (S.D.N.Y.1993), *aff'd*, 17 F.3d 600 (2d Cir.1994); *In re Fugazy*, 150 B.R. 103, 106 (Bankr.S.D.N.Y.1993). Factors that the court should review include:

(1) the balance between the likelihood of the plaintiff's or the defendant's success should the case go to trial as compared with the benefits of the settlement without the expense and delay of a trial;

(2) the prospect of a complex and protracted litigation if the settlement is not approved;

(3) the proportion of the creditors who do not object to or who affirmatively support the proposed settlement;

(4) the relative benefits to be received;

(5) the nature and the breadth of releases to be issued as a result of the settlement; and

(6) the extent to which the settlement is truly the product of arms' length bargaining and not the product of fraud or collusion.

*Fugazy*, 150 B.R. at 106; *see Protective Committee v. Anderson, supra*, 390 U.S. at 424, 88 S.Ct. at 1163. The court should also form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *In re Purofied Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y.1993).

■ As the court noted in *In re Crowthers McCall Pattern, Inc.*, the judge must exercise his or her independent judgment and discretion in examining settlements even where creditors and other parties in interest are silent. 120 B.R. 279, 287 (Bankr. S.D.N.Y.1990). In addition, a court is obligated to make an examination of how the accord affects the rights of third parties. *In re Drexel Burnham Lambert Group, Inc.*, 995 F.2d 1138, 1146 (2d Cir.1993).

■ All of this does not mean, however, that the court must conduct its own investigation concerning the reasonableness of the settlement; the court may credit and consider the opinion of counsel that the settlement is fair and equitable. *Purofied Down*, 150

B.R. at 522. Nor must the court conduct its own mini-trial to determine the merits of the underlying litigation. *Id.* Rather, the court's responsibility is to familiarize itself with all the facts necessary for an intelligent and objective opinion, canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Ionosphere Clubs,* 156 B.R. at 426; *Purofied Down,* 150 B.R. at 522; *In re Lion Capital Group,* 49 B.R. 163, 175 (Bankr.S.D.N.Y.1985).

These standards concerning approval of settlements reflect the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims. *Purofied Down,* 150 B.R. at 522–23; *In re Frost Bros., Inc.,* 1992 WL 373488, *5 (S.D.N.Y. Dec. 2, 1992).

Here, the Objectants assert that the settlement provides unsecured creditors with an amount well below the expected value of prosecuting an action to unwind the leveraged buyout and so falls below the range of reasonableness. There is no dispute as to ease of collection vis-a-vis the Banks, although there is a real question as to the ability to collect from the shareholders and the RTC. Nor is there a dispute as to the complexity of this proceeding. All agree that this is an enormous litigation involving complicated claims and cross-claims. Rather, the debate here concerns Best's probability of success in prevailing on the fraudulent conveyance claims and what is in the best interest of the creditors. I will tackle first Best's probability of success.

### A. *The Probability of Success*

#### 1. *The LBO Action*
##### a. *Choice of Law*

For Best to prevail, it would have to surmount numerous hurdles, the first of which is choice of law. In determining the choice of law issue, the court probably would apply federal common law choice of law rules because the court possesses federal question jurisdiction over any claim based on section 544(b) of the Bankruptcy Code.[27] *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (federal common law in specialized areas where jurisdiction is not based on diversity has been sanctioned by the Supreme Court since the *Erie* case was decided); *Koreag, Controle et Revision S.A. v. Refco F/X Associates, Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 350 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992) (case under section 304 of the Bankruptcy Code in which, in dicta, circuit court indicated that federal principles should guide consideration of which jurisdiction's substantive law to apply in cases arising out of federal law, particularly where important federal bankruptcy policy is implicated). The federal common law approach, consonant with section 6(2) of the Restatement (Second) of Conflict of Laws (the "Restatement"), is to employ the law of the jurisdiction with the most significant relationship. So, too, if one employs the choice of law test for tort claims (the most likely test to be utilized) in this fraudulent conveyance action, under section 145 of the Restatement one is directed to the law of the state with the most significant relationship to the occurrence and the parties under the principles stated in section 6. In that instance, contacts to be taken into account in applying the principles of section 6 include the place where the injury occurred; the place where the conduct causing the injury occurred; the domicil, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered.

Best is a Virginia corporation whose headquarters are in that state. Its catalog showrooms and jewelry stores are located in twenty-two and seven states, respectively.

---

27. One other possibility is that the court would determine that the forum's choice of law rules apply to determine the substantive law governing a fraudulent conveyance claim under section 544(b) of the Bankruptcy Code. *See, e.g., In re O.P.M. Leasing Services, Inc.,* 40 B.R. 380, 391–92 (Bankr.S.D.N.Y.), *aff'd,* 44 B.R. 1023 (S.D.N.Y.1984).

Best's distribution centers are in Virginia, Nevada, Colorado and Washington. In addition, Best operates a nationwide mail-order business. Given the nature of its business, Best's creditors are not confined to one jurisdiction. (The current composition of the creditors' committee reflects this: three of the members are from New York, three are from New Jersey, one is from Hawaii and two are from California.) Citing a variety of fraudulent transfer cases, including some LBO cases, the Banks have made a creditable argument that the law of the place of the target company's principal place of business or the site of the property at the time of its conveyance ought apply, tests which would yield Virginia as the state whose substantive law should be employed. Best, on the other hand, joined in this instance at least by the Objectants, contends that the law of New York ought apply because the LBO was negotiated and consummated (through the tender offer and loans) here, because the Banks and A & S hale from New York, and because the various documents underlying the LBO are governed by the law of New York. These two views do not constitute the universe of possibilities, however. Building on *O.P.M. Services,* a recent law review article suggests that the key to choice of law decisions regarding fraudulent transfers is the constituency to be benefitted by the action, the unsecured creditors. The author suggests that the law of the creditor's state should prevail. To this end, he says, courts could employ the "greatest concentration of creditors' approach" of *O.P.M.,* the laws of the states where each creditor is located (no small endeavor in a case such as this), or the law of the state of that creditor whose law would provide the most benefit to the creditors as a group. T. Day, *Solution for Conflict of Laws Governing Fraudulent Transfers: Apply the Law That Was Enacted to Benefit the Creditors,* 48 Bus.Law. 889 (1993) (hereinafter *Day* ).

The issue of which state's law applies is critical, as the examiner recognized. In other words, in the jargon of choice of law, the conflict here is a true conflict. If the applicable law is Virginia's, the chances of Best's recovery are slim. This is so because Virginia did not enact either the Uniform Fraudulent Conveyance Act or the more modern Uniform Fraudulent Transfer Act, both of which have extensive constructive fraud provisions. That state essentially limits recovery to cases of actual, as distinguished from constructive, fraud and no one has demonstrated any ability of Best to prove a case of actual fraud. Virginia also will avoid a gift if it is not founded upon consideration deemed valuable in law, but as the Fourth Circuit Court of Appeals recently held, slight consideration, rather than "fair" or "reasonably equivalent" consideration, will suffice to save such a transfer from avoidance in the commercial context. *See C–T of Virginia, Inc. v. Euroshoe Assocs. Ltd. Partnership,* 762 F.Supp. 675 (W.D.Va.1991), *aff'd,* 953 F.2d 637, 1992 WL 12307, *2 (4th Cir.1992) ("We agree that [Virginia Code Annotated section] 55–81 does not require [the transfer of] reasonably equivalent value."); *accord In re Springfield Furniture, Inc.,* 145 B.R. 520, 533 (Bankr.E.D.Va.1993). And here, the Banks undeniably parted with a great deal of consideration, some of which remained with Best and some of which benefitted the shareholders.

New York, in contrast, has enacted the earlier of the Uniform acts, enabling Best to recover if it can demonstrate that it did not receive fair consideration for its conveyances or obligations and that (i) it was rendered insolvent by the LBO, (ii) the LBO left Best with unreasonably small capital or (iii) Best believed when it made its conveyances and incurred its obligations that it would incur debts beyond its ability to pay as they mature. *See* New York Debtor and Creditor Law §§ 273, 274 and 275 (McKinney 1990). (As to the last of the three statutory possibilities, nothing in the record adduced by the Objectants suggests that Best believed at the time of the LBO that it would incur debts beyond its ability to pay.[28] Indeed, the Banks presented some evidence that Best

---

**28.** The RTC asserts that to prevail under DCL § 275 Best would not have to show that it subjectively believed that it would incur debts beyond its ability to pay. The law would appear to be otherwise. *See, e.g., United States v. 58th Street Plaza Theatre, Inc.,* 287 F.Supp. 475, 498 (S.D.N.Y.1968); *Matter of Russo,* 1 B.R. 369, 381 (Bankr.E.D.N.Y.1979).

believed, and reasonably so, that it could pay its LBO debts.)

The examiner issued a preliminary report on the choice of law issue, concluding that the case for the application of New York law was the stronger, but that the question was a close call. Few courts, however, have considered the matter of choice of law for fraudulent transfers involving contacts in more than two states or where the choice of law could be outcome-determinative. *See Day,* 48 Bus. Law. 889, 889–91. Thus, the risk to Best inherent in the choice of law dispute is heavy. If Best were to lose the choice of law fight, it might find itself having spent a small fortune on litigation,[29] only to recover nothing at all on these claims. Or as Best's special counsel put it, "if we lost on that point we were in the soup." Tr. at 394.

#### b. *Insolvency*

Assuming that Best were to successfully surmount the choice of law hurdle, it would still be left with formidable obstacles to recovery under New York law. One of these is whether Best was insolvent at the time of or rendered insolvent by the transfers. Section 271 of New York's Debtor and Creditor Law ("DCL") provides that a person is insolvent "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." Unfortunately, the DCL does not define the term "present fair salable value" and there is no accepted test for determining solvency under the DCL. As a result, various tests were used by the examiner (aided by his financial advisor) and the experts who testified at the hearing to approve the compromise and confirm the plan.

■ The first question unanswered by the statute is whether one should value the target using the balance sheet approach or the going concern approach. The former approach is easier to administer and probably yields a lower value, which accordingly increases the odds of success. The going concern approach, which arguably yields a more precise indication of value, is a fact-intensive technique that offers a corresponding poten-

tial for disagreement, such as was revealed by the testimony here. The range of opinion on Best's solvency or insolvency is demonstrated below:

*Reconstituted Balance Sheet Analysis.*

Using this approach, the examiner concluded that Best's assets exceeded its liabilities and, therefore, that Best was solvent.

*Liquidation Analysis.*

Using a forced-sale or orderly approach to liquidation, the examiner determined that it was probable that Best was insolvent.

*Comparable Public Trading Multiplier Analysis.*

Using this analysis, the examiner concluded that Best was insolvent unless a control premium of 45% to 60% could have been obtained at the time of the LBO; given the merger mania of 1987, however, the examiner believed that a 55% control premium may have been justifiable in late 1987 and early 1988. MHT's expert testified that employing this analysis showed that Best would be valued in excess of its long-term debt at the time of the tender offer and at the merger date, even without the control premium to which the examiner adverted.

*Comparable Merger and Acquisition Multiplier Analysis.*

Under this method of analysis, the examiner concluded that Best was solvent by a small amount, but he also voiced the opinion that an expert legitimately could conclude through adjustments of the calculation that Best was insolvent. MHT's expert identified a number of errors committed by the examiner's financial advisor in performing its analysis; correcting for the errors, he concluded that Best was solvent by a wide margin.

*Discounted Cash Flow Analysis.*

The results of the analysis were dramatically different from expert to expert. One of the RTC's experts, a financial analyst, concluded that Best was insolvent based upon his revised projections. The other of the RTC's experts, an economist, did not perform this analysis because his revised projections showed that Best had negative

---

**29.** See the discussion below on the costs of trying this case.

cash flows for each of the 10 years following the LBO; the discounted cash flow analysis was meaningless in the face of consistently negative cash flow. MHT's expert concluded that Best was solvent by a wide margin. The examiner, using his own more conservative projections rather than those created by A & S at the time of the LBO, concluded that Best was insolvent as of the time of the tender offer. It should come as no surprise that the inconsistent conclusions of the experts were tied to disagreements on the underlying data. A sampling of these includes:

*The Projections Used.*

The examiner performed a discounted cash flow analysis, as mentioned above, based upon A & S' projections as well as his own projections. MHT's expert performed the same analysis based upon the A & S projections and projections prepared by MHT at the time of the LBO. The RTC's expert performed the analysis based on his own projections.

*Discount Rates.*

The examiner used a range of 15% to 20%, MHT's expert used 13% to 17% and the RTC's expert used 14% to 16%.

*Exit Multiplier.*

The examiner used a range of 6 to 10 times earnings before interest, taxes, depreciation and amortization ("EBITDA"); MHT's expert used a multiplier of 8.1 times EBITDA; and the RTC's expert used a range of 5.5 to 6.1 times EBITDA.

In addition, there is an initial difficulty in determining the date of the LBO. Under traditional fraudulent conveyance rules, the solvency test is to be conducted at the time of the conveyance or incurrence of debt which is challenged. *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1126 n. 8 (5th Cir.1993); *In re Morris Communications NC, Inc.*, 914 F.2d 458, 466 (4th Cir.1990). Possible candidates for the date of the solvency determination include the date the merger agreement was signed, the date of the tender offer, the date of the merger or,

possibly but less likely, the date when MHT's real estate bridge loan was refinanced on a permanent basis. The examiner concluded that the most appropriate date was the tender offer date since once 97% of Best's shares were acquired, the merger became a foregone conclusion. The RTC's financial expert, in contradistinction, utilized only the merger date.

This short summary of the opinions of the experts demonstrates, much as Best's special counsel testified, that there would be potentially credible evidence on both sides of the issue of solvency with the result that "[t]his would be a very, very hard case to predict." Tr. at 404.

### c. *Unreasonably Small Capital*

Another of Best's obstacles would be to show that the LBO left Best with "unreasonably small capital" with which to conduct its business. DCL § 274.[30] As the examiner explained, the legal test is "far from clear." Debtors' Exh. 76 at 218. Some of the cases have looked at the reasonableness of the projections made by the LBO participants to determine whether they were reasonable. Under these cases, a company may be adequately capitalized even if it is not sufficiently strong to withstand any and all setbacks to its business. The examiner characterized as a "trend" the focus on the reasonableness of the projections used to justify the transaction. *See* Debtors' Exh. 76 at 220–21. Another possibility is to concentrate on whether assets (or unencumbered assets) exceed liabilities. Other cases have focused on working capital levels.

MHT analyzed this issue at the time that it was conducting its due diligence regarding the LBO and concluded that Best would not be left with unreasonably small capital. Claude Marvin of MHT testified that "there would be an adequate buffer for reasonably foreseeable contingencies for this company." Tr. at 1343. It was his opinion that permanent inventory reduction which was planned (which would reduce the sum of money needed for working capital) and excess value of

---

**30.** The following discussion pertains as well to Best's claims under section 275 of the DCL which deems avoidable every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature.

the real estate, that is, value greater than the loans against the real estate, would be available to take out much of the permanent debt, which made MHT "very comfortable with the possibility of success here." Tr. at 1343–44.

As with solvency, the opinions of the experts varied widely. The examiner found the A & S projections too optimistic and concluded that Best would have had a difficult time fulfilling its capital obligations under the more conservative scenarios which he developed. Thus, it was his opinion that Best had a 40% to 60% chance of proving that it was left with inadequate capital because the LBO did not provide a sufficient "capital cushion" to provide for contingencies which might affect Best's performance. (The midpoint of the examiner's range is, of course, 50%, meaning that Best had only an even chance, in the examiner's opinion, of prevailing on this issue.)

The RTC's financial expert concluded that Best was inadequately capitalized. He believed that Best would be unable to pay its debts in the first year of the projection period (which was not the case, as it so happens). His conclusion was based on the assumption that the 12⅝% notes were short-term obligations due and payable in fiscal year 1989. By their face, they were not due until 1996 and A & S had contracted for sufficient borrowing capacity that it might have been reasonable to assume, as had A & S, that the notes could be retired. This expert also treated the $41.5 million of Senior Subordinated Bridge Notes held by the Rockefeller Syndicate at the merger as short-term obligations due and payable in fiscal year 1989. But these Bridge Notes could be "termed-out" and converted to long-term commitments. As a backstop, Best had anticipated that the Bridge Notes could be refinanced by public junk bonds during 1989. One could argue, therefore, that it was inappropriate to consider this debt short-term. In addition, this expert conceded that it was reasonable for A & S to assume that it would be able to refinance the loans on the real estate, yet he treated these loans as due and payable in

fiscal year 1989, a treatment which also could be challenged at trial.

MHT's expert concluded that the LBO did not leave Best with unreasonably small capital. His analysis posited a chain of events that might have been considered unforeseeable at the time of the tender offer and merger and which might have been considered to have caused Best's financial collapse. These events included the recession which, in his opinion, deeply affected Best and other retailers, Best's inability to refinance the Senior Subordinated Bridge Notes as a result of the collapse of the junk bond market and the curtailment of trade credit to Best. (The last of these events, one could argue, as did the RTC's economist, was an effect of an inadequate capital structure rather than a cause of it.) In MHT's expert's opinion, the adequacy of Best's capital was demonstrated in part by Best's ability from late 1988 through mid–1990 to meet its short-term obligations through a combination of internally-generated and external funds, including normal trade credit. It is his belief that Best's ability to meet its obligations became impaired in mid–1990 when its trade creditors, reacting to the general economic decline that began in the fall of 1989 and the spate of large, retail chapter 11 cases which had just been filed, contracted credit terms and limited credit to Best, creating a concomitant need for additional working capital to purchase inventory.

The examiner considered these same events and concluded that the complete disappearance of the junk bond market may have been unforeseeable in October, 1988, but that it may have been foreseeable that there would be difficulty in placing a retail subordinated debt issue. (His report does not indicate the basis for this belief.) The examiner also questioned the applicability of the recession to his analysis since retail stocks performed favorably throughout 1989 and many retailers did not experience a significant impact from the recession until 1990.[31]

---

31. As the RTC's economist testified, discount retailers, such as Best, may not be adversely affected by a downturn in the economy because upscale customers may "trade down" in such times,

shopping in less fancy stores. Tr. at 1021. MHT's expert agreed with this assessment. Tr. at 1775–76. Indeed, Best's gross margin actually increased during the earlier 1981–82 reces-

The RTC's economist utilized so-called "survivorship theory," measuring the adequacy of Best's capital against the capital structure of firms that "survived" through the 1980s and into the 1990s. One could question, however, his selection of "surviving" and "failed" companies and his use of subsequent historical data. He also plotted the "Z Score," a test encompassing five financial ratios, for failing firms to determine if Best was in the range of the failing firms, which it was. This expert admitted, however, that the Z Score methodology has been criticized by noted scholars. Even its own author, Prof. Edward I. Altman, questioned its relevance to companies other than the small manufacturing companies to which he originally applied it. In fact, Prof. Altman has introduced a new scoring system called the "Zeta Score" which is proprietary and which the RTC's expert did not utilize because it would have entailed payment of a fee to Prof. Altman.

As with the issue of solvency, the date of the LBO could conceivably make a big difference in considering the reasonableness of the projections produced by the LBO participants. The RTC's financial expert used the knowledge available as of the merger date in March, 1989 rather than as of the tender offer date in November, 1988. He admitted that a number of events that were unknown or not as evident in the fall of 1988 but which were known in March, 1989, affected his opinions regarding the reasonableness of projections. Unlike this expert, the examiner focused his analysis of the projections on the tender offer date, thereby eliminating any possible claim of hindsight-induced clairvoyance and analyzing the projections based on the state of the knowledge of the LBO participants as of the time the projections were actually made.

Reviewing the record with respect to unreasonably small capital, one is left with the conclusion that the evidence at trial probably

could be viewed either favorably or unfavorably toward Best. One could criticize the opinions of each of the experts to some extent, making any call on how this issue would be resolved difficult. Since almost everybody would agree that the statutory test requires something short of insolvency, one might be tempted to conclude that Best would have an easier time of it than with the insolvency grounds for constructive fraud. But there is another difficulty with this section of the DCL as well, for it designates as avoidable only a "conveyance" whereas the section on insolvency designates as avoidable both a "conveyance" and an "obligation incurred." This distinction was not lost on the examiner, who discussed the possibility that Best would be unable to avoid the incurrence of unsecured debt. This would be significant given that a substantial amount of the LBO debt was unsecured. *See* Debtors' Exh. 76 at 254–56.[32]

### d. *Fair Consideration*

Another hurdle to overcome, although somewhat easier for Best relative to the Banks than those just discussed, is fair consideration, which is a component of each of New York's constructive fraud statutes. Fair consideration, defined in DCL § 272, has two prongs, the adequacy of the consideration and good faith. To prove lack of fair consideration, Best would have to successfully "collapse" the LBO to reflect economic realities. If Best could accomplish this, it would show that much of the consideration for the debt which it incurred went not to Best, but to its shareholders. As I explained in an earlier decision in this case, "[in] reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction.... In deciding whether to collapse the transaction and impose liability on particular defendants,

---

sion. Tr. at 1775. If this principle is true, then the argument by the Objectants that the A & S and MHT "downside" projections were too rosy loses some force.

**32.** The RTC urges that "conveyance" ought to be construed broadly to include an "obligation incurred." Such a construction would seem to fly

in the face of ordinary rules of statutory construction since "obligation incurred" appears in some, but not all, of the sections of the DCL and since that construction would render superfluous the same phrase in those instances when it appears.

the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme." *In re Best Products Co., Inc.*, 157 B.R. 222 (Bankr.S.D.N.Y.1993); *see Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993) (stating that an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its implications). There is some disagreement in the commentary and the courts, however, over the standards to apply when faced with a plaintiff's request that an LBO be collapsed. *See* 4 J. Queenan, P. Hendel and I. Hillinger, *Chapter 11 Theory and Practice*, § 27.13 at 27:35–27:37 (1994) (hereinafter "*Queenan*").

e. *Remedies Against the Banks.*

One of the murkiest areas of fraudulent transfer law as applied to LBOs is what remedy to apply when the plaintiff prevails. *See* R. White, *Leveraged Buyouts and Fraudulent Conveyance Laws Under the Bankruptcy Code—Like Oil and Water, They Just Don't Mix,* 1991 Annual Survey of American Law 357 (in the conclusion). The parties here are at polar extremes in their assessment of how the estate would be benefitted by proving the voidability of Best's LBO. The Banks urge that if the LBO were unwound, their security would be avoided and they might have to disgorge fees, interest and other sums paid to them but that they would be left with a claim equal to the consideration which they paid, albeit that much of that consideration made its way into the pockets of the selling shareholders. Thus, they urge that their claims against the estate (for some $322 million) would subsist and would be amplified by the sums which they had to disgorge. The Objectants contend that the Banks would be left with nothing—no security; no interest, fees and other sums paid; and no claim for what they disgorge or the outstanding LBO obligations.

 To attempt to make some sense out of what is muddled, we need to take a moment to remember some fundamentals about fraudulent transfer law. Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive. *See Queenan*, § 27.14 at 27:38. This intent is evident under the DCL from the sections dealing with remedies, which are expressly limited to recoveries by creditors. *See* DCL §§ 278 and 279. A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance. 1 G. Glenn, *Fraudulent Conveyances and Preferences*, §§ 111 at 221 and 113 at 223 (1940) (hereinafter, "*Glenn*"). Because the fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding. "It was said in Coke's time, and it has been true ever since, that a gift made in fraud of the donor's creditors is good against the donor and his privies." 1 *Glenn*, § 114 at 225 (footnote omitted) (citing, among other decisions, *Jackson v. Garnsey*, 16 Johns. 189 (N.Y.1819)).

 From this fundamental principle flow some corollaries. The first is that even were an obligation avoided as in fraud of creditors, pursuant to section 544(b) of the Bankruptcy Code (which "borrows" the applicable nonbankruptcy law) and section 550 (the remedies section) that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity. *In re Crowthers McCall Pattern, Inc.*, 120 B.R. at 288; *see* 4 L. King, *Collier on Bankruptcy*, ¶ 544.03 at 544–20 (15th ed. 1994); *cf. Whiteford Plastics Co., Inc. v. Chase National Bank of New York*, 179 F.2d 582 (2d Cir.1950) (after arrangement with creditors was confirmed under former Bankruptcy Act, debtor could not avoid lien of creditor where the benefit would flow only to the debtor and not to the creditors). The next corollary is that when the fraudulent transfer is avoided, the parties are restored to their previous positions. *Glenn* set forth the corollary and explained its rationale as long ago as 1940.

[When] the grantee has to surrender security or refund a payment, he is left where he began, with a debt. To deprive the erstwhile grantee of the rights that belong to his present position as a creditor, would not be just. Nor is such an idea within the scope of the statutes against fraudulent

conveyances, because when a conveyance is avoided, the parties are restored to their former position.

This principle was recognized by our bankruptcy courts; and so a rule developed by which a fraudulent grantee, once he had lost a suit brought against him by the trustee in bankruptcy, was given leave to prove a claim as creditor in the bankruptcy of the debtor although the statutory period for proof of claims had expired during the litigation. This rule, clearly established, applies regardless of whether the grantee was guilty of actual or constructive fraud. Hence the provision of our present Bankruptcy Act ... is merely a codification of our case law in bankruptcy.

1 *Glenn*, § 260a at 446–47 (footnotes omitted).

Just five years after the treatise expounded upon this area of fraudulent transfer law, the Second Circuit confirmed the rationale in *First Trust & Deposit Company v. Receiver of Salt Springs National Bank (In re Onondaga Litholite Co.)*, 218 F.2d 671 (2d Cir.), *cert. denied*, 349 U.S. 944, 75 S.Ct. 872, 99 L.Ed. 1271 (1955). There a bank lent the borrower working capital. When the borrower defaulted, the bank became a voting trustee of the company. The bank also owned first mortgage bonds issued by the borrower and secured by certain property. The borrower defaulted on these bonds, the bank foreclosed and it bought all the mortgaged property for a sum that was adjudicated in the state court to give rise to a fraudulent transfer. In satisfaction of the judgment, the bank disgorged the sum adjudged by the state court to be due to the borrower's bankruptcy trustee and sought to share in the enhanced estate. The referee in bankruptcy refused to permit the bank to share with the other creditors; his decision was affirmed by the district court. The Second Circuit reversed, explaining that section 57(g) of the former Bankruptcy Act (which allowed the claims of creditors who had surrendered transfers voidable under the Act) "was not designed to punish a creditor who

had sought to withhold the debtor's assets from the bankruptcy estate. If a creditor having a valid common claim free from equitable infirmities, in an effort to obtain satisfaction of his claim or security therefor, accepts a conveyance of assets of his debtor— later the bankrupt—with actual intent thereby to defraud the debtor's other creditors, nevertheless, if after adjudication he surrenders the assets thus acquired to the court, he may share on a parity with other creditors. And it makes no difference that the surrender is the result of a successful action instituted by the trustee against the creditor ..." *Id.* at 673.

■ This same policy is recognized under current bankruptcy law. Section 502(h) of the Bankruptcy Code provides that the claim of a creditor arising from the recovery of property under section 550, among others, shall be allowed or disallowed the same as if the claim had arisen prepetition. And section 502(d), much like section 57(g) of the former Bankruptcy Act, disallows the claim of any recipient of a fraudulent transfer unless the recipient has paid the amount or turned over any property for which it is liable under section 550. Thus, there is an implication in section 550 that a transferee of a fraudulent transfer will have a claim when the transfer is disgorged.

This is not to say that every person who is the recipient of a fraudulent transfer is entitled to a claim against the estate. For if the transferee gave no consideration for the transfer, there is no underlying debt. Nor do the statutes answer the question whether the lender in an avoided LBO has a claim for all the consideration given, as the Banks contend here, even if some portion of that consideration is given to the debtor's selling shareholders. But this much is unassailable: to the extent that the lenders gave consideration to the debtor, such as here, in the form of working capital which the Banks gave to Best at the time of the merger[33], the lenders would have a claim which would be allowable so long as they satisfied the judgment arising out of the fraudulent transfer action.

---

**33.** Some of the proceeds of the Term Loan and the Bridge Loans would also probably qualify as consideration flowing to Best in that they were made available to pay back antecedent debt of Best. *See* Debtors' Exh. 35 at ¶¶ 2.4(e) and 3.4(e) and Sch. VI.

There is respectable commentary to the effect that LBO lenders should have a claim for all the consideration with which they have parted. *See White* ("Invalidation of the LBO lenders' obligations against the estate (perhaps coupled with a return of all prepetition transfers of the debtor's property) is the harshest available remedy. Invalidation seems particularly draconian in a legitimate LBO because the creditors actually parted with value. Fortunately, courts have severely limited this remedy to situations involving intentional fraud, upstream guaranties and the exchange of debt for equity. In such cases, the cancellation of obligations works no injustice."); *see also Misty Management Corp. v. Lockwood*, 539 F.2d 1205, 1214 (9th Cir.1976) (under former Bankruptcy Act, transferee in case of actual fraud was allowed an unsecured claim against the estate in the amount of the consideration it gave rather than in the lesser amount of the consideration received by the transferor debtor).

On the other hand, if the underlying fraudulent transfer statute (such as DCL § 273) provides for the avoidance as fraudulent of an obligation incurred, it could be argued fairly persuasively that so much of the obligation which the debtor incurred as was not supported by consideration *to the debtor,* ought be avoidable. *Cf. McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. 342 (Bankr.S.D.N.Y.1987) (under section 548 of the Bankruptcy Code, where consideration for transfers which left debtor insolvent was paid to debtor's principal and his family, rather than to the debtor, the debtor's transfers were made for less than a reasonably equivalent value and were avoidable); *accord* 1 *Glenn* § 286 at 481.

Parsing through all of this, one surmises that the estate would list the Banks as creditors even if the LBO were deemed a fraudulent transfer. Thus, the recoveries to the estate and the avoidance of obligations would enure to some extent to the benefit of the Banks as well, diminishing the recoveries to the other creditors, contrary to the assertions of the Objectants. To what extent the Banks would share in the estate is impossible to ascertain now because the remedies may differ depending on the grounds for avoidance of the LBO and because it is not clear what recovery Best might have against other defendants. And this brings us nicely to a brief discussion of the possible recoveries against other defendants.

### f. *Recoveries Against Other Defendants*

Best's difficulties are not limited to those issues which are essential to impose liability on the Banks. There are substantial hurdles vis-à-vis the shareholder defendants as well. In particular, the shareholders (both inside and outside) have raised the applicability of the so-called "settlement payments doctrine" under 11 U.S.C. § 546(e). Utilizing this section of the Code, the Tenth Circuit held in *In re Kaiser Steel Corp.*, 952 F.2d 1230 (10th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992), that the payments which were made to the former shareholders in an LBO were not recoverable because they were exempt as settlement payments. There is no lack of scholarly criticism of the decision, *see, e.g.,* G. Smith and F. Kennedy, *Fraudulent Transfers and Obligations: Issues of Current Interest,* 43 S.C.L.Rev. 709 (1992); 4 *Queenan,* § 27.11, but the Second Circuit has yet to rule on the issue. Acknowledging this, Best's special counsel testified that he believed that the issue would be ripe for certification for an interlocutory appeal. Tr. at 407.

Another difficulty is whether Best will be able to certify as a defendant class its outside shareholders who tendered their shares. Included as issues under this umbrella is a host of subsidiary questions some of which are whether the putative class representatives could adequately represent the interests of the class as a whole; whether or not all defendants had common claims; whether Best could show a typicality of defenses; and how the opt-out provisions of Fed.R.Civ.P. 23(b)(3) would affect the outcome of the class action. Best's special counsel believed that certification was a "substantial probability" but not free from doubt and he noted that a decision favorable to Best likely would be appealed to the district court and the court of appeals. Tr. at 389–90. Even were Best successful, the procedure is a cumbersome one which would do little to expedite the litigation.

### 2. *The Bank Preference Action*

In the Bank Preference Action, Best has sued the Banks to avoid the grant of a security interest in certain inventory the value of which is approximately $25 million. Tr. at 129. The Banks have denied that Best was insolvent on the date of the transfer and, additionally, have pleaded the defense of new value pursuant to section 547(c)(4) of the Code. Best believes that it has a high likelihood of success in this action. Tr. at 129–30. Part of the settlement with the Banks is the avoidance of the security interest which was granted, in other words, all of the relief which is sought.

### B. *The Prospect of Complex and Protracted Litigation*

From the discussion just finished of Best's likelihood of success, it is readily ascertainable that the LBO Action is complex and most certainly would be protracted, including very extensive discovery, motion practice, and, in all likelihood, interlocutory appeals before the case were ever tried. To savor the taste of what would come if the settlement were to be rejected, one need only to have sat through the hearing on approval of the compromise, which itself consumed some eight days and produced many hundreds of pages of posthearing briefs. Best's special counsel rather optimistically projected that the total cost of the litigation would be $5 million. Given that prior to the compromise special counsel had billed some $1.2 million for 15 months' of work, during which there was extensive document discovery but also almost six months during which the litigation was stayed, that $5 million seems an unrealistic estimate. The examiner projected that the litigation could cost somewhere in the vicinity of $15 million. It would seem that his view was probably closer to the mark, as Best's special counsel conceded when he testified. In addition, there can be little doubt that the action would have taken a period of years to try to its conclusion, in light of the likelihood of interlocutory appeals as well as appeals from whatever decision were rendered on the merits.

With respect to the Bank Preference Action, if there were no settlement, then that action, too, would have to be tried. The record does not contain any evidence concerning the cost of that suit, but it is fair to assume that it would be but a fraction of the cost of the LBO litigation, since the law of preferences is considerably more developed than the law of fraudulent transfers as applied to LBOs.

### C. *Support for the Settlement*

Remember that Best put this compromise into the plan rather than simply bringing it on for a hearing. Thus, whereas the court usually has to infer creditor assent from lack of creditor opposition, here the creditor body voted on the plan, one of the cornerstones of which was the compromise of the LBO and Bank Preference Actions. Creditor support was overwhelming. All classes of creditors other than the subordinated lenders have voted to approve the plan containing the compromise of the suits.

### D. *Relative Benefits to be Received*

The Objectants challenge as inadequate the consideration to be received by the estate. They believe Best should have been obtaining a settlement in the range of hundreds of millions of dollars, rather than scores of millions of dollars. As discussed earlier in this decision, pursuant to the contemplated settlement, A & S will pay Best $2 million, the Inside Shareholders will pay Best $600,000 and the Banks will give up their distribution of some $23 million in cash and $8 million in equity.[34] In addition, the Banks will release their liens on $25 million of cash from the proceeds of letters of credit and on $20 million of collateral granted to the Banks in connection with the LBO, of which $4.2 million is presently liquidated. Although it is more difficult to quantify, the Banks have also agreed to take their distributions solely in equity and warrants of the reorganized

---

**34.** There is an alternative valuation of the settlement which would calculate the Banks' cash and equity "give-up" at $38.8 million. This higher valuation is predicated upon the assumption that the Banks would prevail in the Bank Preference Action, an assumption which is questionable. Accordingly, I prefer to analyze the merits of the settlement using the more conservative valuation.

Best, thereby leaving Best with more cash to distribute to the other creditors. Additionally, one cannot lose sight of the fact that the settlement facilitates Best's emergence from chapter 11. The importance of working toward such a negotiated resolution of an LBO litigation is emphasized in the *Queenan* treatise:

> These various causes of action [arising out of an LBO] will usually dominate Target's chapter 11 reorganization proceeding. Yet reorganization is essentially consensual. The debtor and the creditors' committee must therefore make every effort to mesh the claims with a consensual plan of reorganization. This is often done by a settlement which reduces plan distributions to the defendants or potential defendants.

4 *Queenan*, § 27.01 at 27:3.

The value of the Banks' settlement is significant by any measure, albeit not as high as the Objectants wish for. In measuring the propriety of the settlement, one must balance the consideration offered against the undeniably uncertain outcome of the LBO litigation. As mentioned earlier, the choice of law issue could effectively leave Best with no recovery at all on the fraudulent transfer claims, after having spent many millions of dollars in pursuit of a litigated resolution. Moreover, were it to be determined that Best was not rendered insolvent by the LBO, but only that Best was left with an unreasonably small capital, there is a substantial issue regarding Best's ability to avoid the massive LBO debt. And no matter how successful the outcome, the Banks would remain creditors. Just as important, however, the likelihood of a successful outcome is far from certain; expert opinion has been garnered on both sides of the financial issues and more than one member of Best's senior management has testified that the assumptions underlying the LBO were reasonable. Thus, although I certainly would have preferred a settlement which was palatable to all creditor constituencies, I cannot conclude that the amount of the settlement falls below the lowest point in the range of reasonableness.

### E. *The Nature and Breadth of the Releases*

The settlement will completely end Best's LBO suit, which will be discontinued against the Outside Shareholders, the RTC and the Rockefeller Group. Thus, although the RTC and the Rockefeller Group would have me cast them as victims of this settlement, in a real sense they are beneficiaries of it, since Best will no longer assert against them claims for many millions of dollars. In addition, the settlement will release the Banks from Best's preference claim against them. This is not a case, however, where there is even an arguable violation of section 524(e) of the Bankruptcy Code contained in the settlement, for Best is not purporting to release the independent claims, if any, which any third party might have against the Banks or other settling parties.

### F. *The Extent to Which the Settlement is Truly an Arms' Length One*

The Objectants assert that the settlement with the Banks was not negotiated in good faith. Their initial volley in this battle is to question the propriety of Best's having commenced and then immediately stayed the suit to attempt a negotiated resolution. The short answer to this is that Best obtained court approval on notice to proceed precisely as it did. In any event, the assertion by the RTC is somewhat ironic because one of its attorneys pleaded rather eloquently that I not grant Best's motion to hire special counsel to file and prosecute the LBO claims but that I instead direct the parties to attempt to consensually resolve the claims arising out of the LBO. Tr. at 536–37.

The Objectants also assert that Best did not present a strong case to the Banks in support of settlement because Best did not employ a financial advisor. Given that Best caused an examiner to be appointed who retained a financial advisor (both paid by Best, of course, at a cost of over $2 million), and given that the examiner and his financial advisor each prepared an extensive report, it is hardly surprising, nor a mark of bad faith, that Best did not engage another financial advisor to review the LBO. In addition, Best had its reorganization accountants aid it

in reviewing the numbers which were discussed with the Banks.

The next assertion is that Best did not attempt to achieve any distribution for the subordinated creditors, but the record belies the complaint for the first plan proposal by Best contemplated a recovery for those creditors. The Banks, however, objected to Best's depriving them of their subordination benefits and insisted on the enforcement of the contractual subordination agreements. Pursuant to sections 510(a) and 1129(a)(1) of the Bankruptcy Code, Best was mandated to enforce the subordination agreements unless the parties in whose favor they ran agreed otherwise or unless the subordination agreements were unenforceable under applicable nonbankruptcy law. But Best's efforts to obtain a recovery for the subordinated creditors were not limited to the promulgation of this first plan. Both Mr. Kasen (the only member of the board of directors of Best who was not affiliated with Best at the time of the LBO and who was vested with the sole authority to prosecute and settle the claims) and Best's special counsel tried during the negotiations with the Banks, after suit had been commenced, to obtain something for the subordinated creditors; the Banks simply refused to yield. Tr. 193–94, 229–30, 387, 558 and 599. I cannot fail to note that the motive ascribed to Best makes little sense. Surely Best's very sophisticated counsel must have appreciated that a distribution to the subordinated creditors likely would have caused the Objectants to support the plan, thereby obviating the extremely expensive contested confirmation hearing which was predictable and in fact resulted from a plan which offered nothing except a release to these creditors. In fact, since the first plan which Best promulgated contemplated a distribution to the subordinated creditors, it seems that Best understood that this likely would produce the cooperation of the subordinated lenders.

Best's special counsel spent many hours reviewing the merits of Best's position with the Banks' counsel and met as well with other parties including the RTC and the Rockefeller Group. He only turned away from discussing the merits when it became clear that further discussion of that sort would be fruitless and that debate on the merits would not resolve the differences among the parties. Tr. 187, 462 and 469. Thereafter, Mr. Kasen's efforts (and those of his counsel) turned to hard negotiating with the Banks in the form of a consensual plan which would resolve the LBO litigation. His "meatier" efforts, as he described them, Tr. at 187, spanned a period of months, during which time he repeatedly told the Banks that he did not "think the level that the banks were [at those times] considering was sufficient. . . ." Tr. at 187–88. I am convinced from the record adduced that Mr. Kasen did not abuse his position but sought to achieve the greatest recovery that he could for the benefit of the other creditor constituencies consistent with the needs of the debtors.

It is true, as the Objectants assert, that Weil, Gotshal & Manges ("Weil"), which did not represent Best in the litigation, participated significantly in the later negotiations to settle the LBO action. And it is also true that Weil had previously represented A & S. However, Weil was retained generally to represent the debtors after notice to its twenty largest creditors, which included members of the Rockefeller Group. Certainly the Rockefeller Group knew all along that there was a possibility that claims could be brought arising out of the LBO. Yet it did not object to Weil's retention as general counsel. More importantly, Weil did nothing secret here. Had the RTC and the Rockefeller Group, both of whom were members or ex-officio members of the creditors' committee and thereby knew how the negotiations were being conducted, some quarrel with what Weil was doing, they could have brought it to my attention in time for me to rule on or remedy any perceived conflict. (It bears mentioning, of course, that Best was represented by special counsel who was free of any alleged taint and who continued to confer at all times with Mr. Kasen regarding the progress of the settlement discussions.)

Instead, the RTC and the Rockefeller Group raised the issue only after the record on the settlement hearing was closed, in their posttrial briefs, suggesting that the conflict warranted my disapproval of the compro-

mise. This smacks of a litigation tactic. That impression is fortified by the fact that the Objectants have not objected to the settlement with A & S, a settlement which in fact they have endorsed, notwithstanding Weil's involvement. Weil has indicated in its posttrial reply brief that it actually met separately with the RTC and Rockefeller Group concerning the settlements and the plan without objection. Whereas I ordinarily would disregard a statement of fact not contained in the record, but only in a brief, since the ethical charge first surfaced in a posttrial submission, Weil could not have anticipated the charge to rebut it during the hearing.

 It is well established in this Circuit that motions to disqualify attorneys are generally disfavored and are subject to fairly strict scrutiny to ensure that they are not being interposed merely for tactical reasons. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir.1989); *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). Delay in the presentation of such motions may be considered to evidence the tactical nature of the motion. *In re Trevino*, 78 B.R. 29, 40–41 (Bankr.M.D.Pa.1987) (citing *United States v. Newman*, 534 F.Supp. 1113 (S.D.N.Y.1982)). Here, faced with the manner in which the complaint about Weil surfaced, one is forced to conclude that it is a tactical advantage which was sought to be gained. In any event, except in rare departures, this Circuit has recognized only two circumstances under which disqualification is appropriate:

1) where an attorney's conflict of interest in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client; or

2) where the attorney is at least potentially in a position to use privileged information concerning the other side obtained through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage.

*Nyquist*, 590 F.2d at 1248. The second of these bases is inapplicable here. And as to the first, I have already commented on the vigor of the representation as well as the nonsensical nature of the motive which the RTC and Rockefeller Group ascribe to Weil. Thus, I see no basis for tarring the settlement because of the asserted conflict of Weil.[35]

The final objection is that Best did not consider the alternative of a litigation trust plan except in the context of corporate governance issues. That assertion is factually incorrect. The possibility was discussed with creditor constituencies months before a dispute erupted with the Banks over corporate governance issues. Tr. at 149. Further, it was certainly preferable for Best and its creditors to attempt to resolve the litigation prior to emergence from chapter 11. The use of a litigation trust plan involved significant costs (one of which was that the Banks would never agree to such a plan, making confirmation very difficult, and another of which was the high cost of the litigation itself) and raised its own legal issues, including the peculiar situation of Best suing its major stockholders. There were also practical reasons not to continue the litigation, such as the serious distraction of senior management of the reorganized enterprise. Tr. 205–06, 233–35 and 388–90.

In short, this was an arms' length, good faith negotiation.

G. *The Settlement Should Be Approved*

 I have considered the issues, both legal and factual, raised by the proponents and opponents of the settlement; the impediments to a recovery by Best in the LBO Action; the cost of further litigation both as a dollar figure and as a distraction to a company either remaining in or just emerging from chapter 11; the proportion of the creditors who have voted in favor of the plan; the relative benefits to be received by the estate from the settlement; the nature and breadth of the releases to be issued; and the

---

**35.** Any objection to Weil's conduct is more appropriately raised in the context of its application for compensation. Section 328(c) of the Code provides a remedy if the estate's representative is not disinterested or represents or holds an interest adverse to the interest of the estate with respect to the matter on which the person is employed.

circumstances surrounding the negotiation of the settlement and plan. Having done so at great length, I am prepared to approve this settlement as being fair and equitable and well within the range of reasonableness.

### IV.

It is time now to turn to the remaining objections to confirmation, most of which revolve around the subordination agreements. But before I reach the specifics of the objections, it may be useful to spend just a few moments on the authority of the bankruptcy courts to confirm plans of reorganization.

■ The bankruptcy power emanates from Article I, section 8, clause 4 of the Constitution which provides that Congress has power "[t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." Under this bankruptcy power, Congress may enact laws which govern reorganizations, reorganizations which alike can bind creditors holding unsecured and secured claims. *See* 1 *Queenan* § 4.04 at 4:5–4:6 (citing *In re Reiman*, 20 F.Cas. 490 (C.C.S.D.N.Y.1874) (no. 11,673), *aff'd*, 20 F.Cas. 500 (C.C.S.D.N.Y.1875) (no. 11,675) and *Continental Ill. Nat'l Bank & Trust Co. v. Chicago, R.I. & P. Ry.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935)). To properly adjust the rights of creditors and in a desire to foster the rehabilitation of debtors, Congress is permitted by the bankruptcy power to overlay on state law federal rules for determining which claims are allowable and their entitlement to a distribution. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 169, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring). Congress has exercised this power by enacting chapter 11, which permits the reorganization of debtors with and, under certain circumstances, without the approval of the statutorily defined majority of creditors in each class. Thus we see that the authority of the bankruptcy courts to consider confirmation of plans of reorganization is well within the exercise of the bankruptcy power and, in fact, is central to the fulfillment of the Congressional policy regarding reorganization. In our present jurisdictional scheme, 28 U.S.C. § 1334(b) gives original jurisdiction to the district court (which is then delegated to the bankruptcy court by virtue of a standing order of reference and 28 U.S.C. § 157(B)(2)) of all civil proceedings which, like confirmation of chapter 11 plans, arise under title 11. 1 L. King, *Collier on Bankruptcy*, ¶ 3.01[1][c][iii] at 3–29 (15th ed. 1994) (hereinafter *Collier*). Indeed, 28 U.S.C. § 157(b)(2)(L) denominates as "core" proceedings the confirmation of plans.

With the stage now set, I address the specific objections.

### A. *The Contractual Subordination Issues*

■ The RTC and the Rockefeller Group raise several issues, some jurisdictional and some which go to the merits of their dispute with the Banks, which they claim preclude me from enforcing the contractual subordination agreements as part of the plan confirmation process. Essentially they argue that the RTC's adversary proceedings and the Rockefeller Group's cross-claims must be resolved to determine that a debt is due and owing to the Banks before the subordination agreements can be effective. Their objections in some way or another challenge my ability to make this determination, either at all or in the context of a confirmation hearing. Distilled, their argument is that the LBO Action must be tried to its conclusion (notwithstanding the proposed settlement) before I can even think about confirming this plan of reorganization.

When one pauses and reflects on these arguments, one sees that the jurisdictional arguments which they raise are misplaced. I am not purporting to pass on anything other than the issues which the Objectants (each of which, by the way, has filed a proof of claim) have affirmatively asserted in their opposition to confirmation. *See, e.g.*, RTC Objection to Confirmation ¶ (f) ("The Plan is not confirmable because its proposed enforcement of the subordination provisions of the Intercreditor Agreement is improper in that the senior claims of the banks were fraudulently incurred obligations within the scope of applicable fraudulent conveyance laws.") I am not adjudicating the RTC's pending adversary proceeding or the Rockefeller Group's cross-claims but am simply address-

ing the confirmability of the proposed plan in the face of their objections.[36] The Objectants dangle their objections in front of me while telling me that I have no power to rule on them and, by extension, to confirm the plan. *Cf. In re Financial News Network, Inc.*, 126 B.R. 157 (S.D.N.Y.1991) (where antitrust objections to sale were presented to bankruptcy court, court had jurisdiction to rule on those objections; sole remedy of objectants was to seek to withdraw the reference of the entire sale proceeding or its antitrust components).

Not only may I deal with objections which are raised to confirmation, but I am affirmatively required to deal with any and all objections. *See* Fed.R.Bankr.P. 3020. Moreover, the Bankruptcy Rules explicitly contemplate my dealing with enforcement of subordination agreements within the context of a confirmation hearing. Fed.R.Bankr.P. § 7001(8). Under Rule 7001(8), parties are required to commence an adversary proceeding "to subordinate any allowed claim or interest, *except when subordination is provided for in a Chapter 9, 11, 12 or 13 plan.*" *Id.* (emphasis supplied). This is not to say that the Bankruptcy Rules can confer subject matter jurisdiction where it is otherwise lacking, but the rule establishes that the Objectants' procedural argument that I may deal with contractual subordination only in the context of an adversary proceeding is simply wrong. It is expressly contemplated that such issues may arise in the course of confirmation. Assuming for the moment that I can issue a final order of confirmation (and I will soon show that I can), I must rule on these objections to confirmation.

### B. *The FIRREA Challenge*

The RTC contends that 12 U.S.C. § 1821(j) ("FIRREA") strips me of subject matter jurisdiction to resolve the RTC/Banks intercreditor dispute. This is allegedly so because "section 1821(j) ... explicitly provides that '... no court may take action ...

to restrain or affect the exercise of powers or function of the RTC as a conservator or a receiver.'" RTC Post–Trial Mem. at 62. According to the RTC, this section applies to its assertion of a claim against the Banks "with respect or relating to the Senior Secured Term Notes held by RTC and RTC's collection of all distributions thereon." RTC Obj. at ¶ (c). The upshot is said to be that my signature on a confirmation order which may affect the RTC's rights in its pending adversary proceeding would violate FIRREA in that it would interfere with the RTC's statutory duty "to maximize its realization on assets it holds as receiver for a failed thrift institution" RTC Post–Trial Mem. at 62.

While the disputes determined in this opinion were *sub judice,* Judge Haight denied the RTC's motion to withdraw the reference in the LBO Action and the RTC Preference Action. *In re Best Products Co. Inc.*, 1994 WL 141970 (S.D.N.Y.1994). In so ruling, Judge Haight expressly rejected the RTC's argument that FIRREA nullified "the subject matter jurisdiction [of this court] that would otherwise be exercisable." *Id.* at *2. Judge Haight concluded that in filing a proof of claim in Best's chapter 11 case, the RTC had submitted itself to the equitable jurisdiction of this court and waived any right it may otherwise have had to insist that Best pursue administrative remedies within FIRREA prior to bringing its claim against RTC in the bankruptcy court. *Id.* at *3.

Because I concur with Judge Haight's conclusion that FIRREA does not serve as an impediment to my adjudicating this dispute,[37] I need not address the arguments raised by the RTC, except to note in passing that the expansive interpretation of FIRREA the RTC urges has been consistently rejected by the courts in this Circuit. *See, e.g., In re Colonial Realty*, 980 F.2d 125, 135–135 (2d Cir.1992) (holding that § 1821(j) does not nullify the need for the FDIC to seek relief from the automatic stay); *In re All Season's*

---

**36.** The RTC, the Rockefeller Group and the Banks have spent a great deal of time sparring over the *res judicata* or collateral estoppel effect of any ruling which I may issue in connection with the objections raised to confirmation. I see no reason to consider those issues now.

**37.** As I will discuss below, the RTC by filing a proof of claim has consented to my consideration of both the allowance and priority of its proof of claim. The RTC has also submitted the matter to me as an objection to confirmation.

*Kitchen, Inc.,* 145 B.R. 391 (Bankr.D.Vt.1992) ("Construing FIRREA to require that we must decline jurisdiction over challenges to FDIC's claims against others will … have profoundly adverse impacts upon bankruptcy debtors as well as all the creditors also caught in the web of insolvency."); *see also In re Tamposi Family Investment Properties,* 159 B.R. 631, 637 ("[O]nly those making a claim against assets of the receivership estate need comply with FIRREA's administrative claims procedure requirement; conversely, where the receivership estate is the creditor making a claim against assets in the actual or constructive possession of the bankruptcy estate, then the FIRREA administrative claims procedure is not implicated."), *citing, All–Seasons,* 145 B.R. at 394–397; *Continental Financial Resources, Inc. v. FDIC (In re Continental Financial Resources, Inc.),* 149 B.R. 260 (Bankr.D.Mass.), *aff'd,* 154 B.R. 385 (D.Mass.1993) (FDIC, by filing proof of claim, had actively sought to participate in the distribution of the debtor's estate, thus the bankruptcy court could not be stripped of jurisdiction in a preference action which was the equivalent of a counter-claim to the original proof of claim filed by the FDIC).

## C. *28 U.S.C. § 157(b) and Jury Trial Rights*

Both the RTC and Rockefeller Group assert that I lack the power to issue an order confirming a plan of reorganization which subordinates their claims to those of the Banks. Approval of such a plan, they contend, implicates the RTC's pending adversary proceeding and the Rockefeller Group's cross-claims in the LBO Action, which actions are said by them to be non-core, state law contract disputes which must be resolved by jury trial. Given the Second Circuit's holding in *In re Orion Pictures Corp.,* 4 F.3d 1095 (2d Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994), they contend, I have no subject matter jurisdiction to adjudicate these state law claims notwithstanding that the Objectants each filed a proof of claim and submitted objections to confirmation of the plan directly attacking the validity of the contractual sub-ordinations which the plan preserves and enforces.

■■■ A party's designation of an action as "core," without more, is not dispositive of the issue of whether a jury trial right is implicated. *Germain v. Connecticut National Bank,* 988 F.2d 1323, 1329 (2d Cir.1993); *In re Edwards,* 104 B.R. 890, 898 (Bankr. E.D.Tenn.1989). Were this a non-core matter and were the RTC still entitled to a jury trial, I would be precluded under this Circuit's jurisprudence from hearing the dispute. *See Orion,* 4 F.3d at 1101. In contrast, were I to find that this matter is core, I would have the jurisdiction to enter an order irrespective of whether the RTC still could enforce a right to a jury trial. *In re Ben Cooper, Inc. (Cooper I ),* 896 F.2d 1394, 1403–04 (2d Cir.), *cert. granted,* 497 U.S. 1023, 110 S.Ct. 3269, 111 L.Ed.2d 779, *vacated and remanded,* 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated (Cooper II),* 924 F.2d 36 (2d Cir.), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991); *but see Germain,* 988 F.2d at 1332 (Oakes, dissenting).

■■■ If a particular type of claim is not explicitly mentioned in 28 U.S.C. § 157(b)(2) as a core proceeding, courts consider factors such as whether the rights involved exist independent of title 11, depend on state law for their resolution, existed prior to the filing of a bankruptcy petition, or were significantly affected by the filing of the bankruptcy case. *In re Goodman,* 991 F.2d 613, 617 (9th Cir.1993); *Hoffman v. Ramirez (In re Astroline Communications Company Limited Partnership ),* 161 B.R. 874, 878 (Bankr.D.Conn.1993). The mere fact that the objecting creditors' claims raise state contract law issues does not preclude me from finding that the proceeding is core. 28 U.S.C. § 157(b)(3) ("Determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.")

In this context, it is hard to imagine an issue that is more at the heart of the bankruptcy process than is this. Enforcement of a contractual subordination agreement clearly involves the adjustment of the debtor-creditor relationship, determinations of the

priority of liens, and administration of the estate and so falls within the ambit of 28 U.S.C. § 157(b)(2)(A), (K), and (O). The only published decision which I have found on the subject held that the resolution of a dispute in an adversary proceeding involving Code § 510(a) was a core matter. *In re Pittsburgh Cut Flower, Inc.,* 118 B.R. 31, 34 (Bankr.W.D.Pa.1990) (recognizing that approval or rejection of a plan of reorganization may depend on the outcome of a contractual subordination dispute). I too find that the resolution of this contractual subordination dispute is core. *See also In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 116 (E.D.Pa.1993) (holding that equitable subordination under § 510(c) is similarly core).[38]

That said, I turn to whether the RTC has waived its jury trial right to resolve the subordination agreement dispute. The RTC argues that because the debtor has chosen not to object to its proof of claim, the Second Circuit's decision in *Germain* "destroys the assertion by Best and the Banks that the contractual subordination dispute is part of the claims allowance process." RTC Repl. Mem. at 41–42.[39] Accordingly, the RTC contends that I must find under *Germain* that it still retains its right to a jury trial notwithstanding that it filed a proof of claim in this case. My reading of *Germain* does not aid the RTC's cause but harms it.

 It is well settled that by filing a proof of claim in a bankruptcy case, a creditor triggers the process of "allowance and disallowance of claims," thereby subjecting the filing creditor to the bankruptcy court's equitable jurisdiction. *Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 58–59 & n. 14, 109 S.Ct. 2782, 2798–99 & n. 14, 106 L.Ed.2d 26 (1989); *In re Hooker Investments, Inc.,* 937 F.2d 833, 838 (2d Cir.1991); *Best,* 1994 WL

141970 at *3. The Second Circuit has held that a waiver of a jury trial does not automatically result merely from the filing of a proof of claim. *Germain,* 988 F.2d at 1330. Rather, for a waiver to occur, the dispute before the court must be "part of the claims-allowance process *or affect the hierarchical reordering of creditors claims.*" *Id.* (emphasis supplied); *Langenkamp,* 498 U.S. at 44, 111 S.Ct. at 331 (citing *Granfinanciera,* 498 U.S. at 57–58, 109 S.Ct. at 407–08 (a necessary finding for a waiver is that the creditor's claim and the related action be "integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction.")).

 As the Third Circuit declared only a month ago, plainly a creditor who submits a proof of claim against the bankruptcy estate relinquishes any right to a jury trial on issues raised in defense of that proof of claim. *Billing v. Ravin Greenberg & Zackin,* 22 F.3d 1242, 1250 (3rd Cir.1994) (*citing Langenkamp,* 498 U.S. at 45, 111 S.Ct. at 331–32.) Analytically, the RTC's attack on the subordination agreement, mounted in the objection to the plan and in the RTC's adversary proceeding, is a defense of its right to a distribution from the estate. The Second Circuit recognized that a creditor can also waive a right to a jury trial when it commences an action which implicates the priority of creditor claims. *Germain,* 988 F.2d at 1329–30. Specifically, the Court held:

> [i]t is reasonable that a creditor ... who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process, such as those involving the determination of who is a valid creditor *and which creditors are senior in the creditor hierarchy.*

---

**38.** One could cast the attempt by the Objectants to escape the consequences of the agreements as an endeavor to equitably subordinate the Banks to the Objectants because the LBO was fraudulent. It is this interpretation which the Banks urge. In the event that this interpretation were employed, there is no question but that the RTC's adversary proceeding and the Rockefeller Group's cross-claims would be core.

**39.** This statement ignores the fact that, as Judge Haight observed, Best's claims in the LBO Action asserted against the RTC (and the Rockefeller Group, too, although it was not before Judge Haight) analytically are the equivalent of counterclaims to the RTC's original proof of claim.

*Id.* (emphasis supplied). Reorganization under court aegis necessarily involves resolution of certain intercreditor issues, including those related to the priority of distribution. *See In re Envirodyne Indus., Inc.,* 1993 WL 566566, at *3 (Bankr.N.D.Ill. Dec. 13, 1993) (enforcement of subordination provisions "is not only proper, but required under § 510(a) and § 1129(a)(1)"). Thus, at least in this circuit, courts must consider both whether the dispute affects the reordering of "creditor-creditor" relations as well as "debtor-creditor" relations. *Germain* instructs us that

> [a]n action that bears directly on the allowance of a claim is integrally related to the equitable reordering of debtor-creditor and creditor-creditor relations. If an equitable reordering cannot be accomplished without resolution of what would otherwise be a legal dispute, then that dispute becomes an essential element of the broader equitable controversy.

988 F.2d at 1329.

Applying the law to the facts, an equitable reordering of the debtor-creditor and creditor-creditor relations cannot be accomplished in this case without resolution of the intercreditor dispute. *See Germain,* 988 F.2d at 1329. The RTC essentially has admitted as much when it requested that I order the debtor to escrow the distributions to the Banks pending resolution of this dispute.[40] Accordingly, I find that the resolution of the subordination agreement dispute has become an essential element of the broader equitable controversy such that the RTC has waived its right to a jury trial.

#### D. *The Effect of Orion*

 The RTC and the Rockefeller Group urge that *Orion* mandates that I conduct a separate adversary proceeding to determine the enforceability of their subordination agreements. In *Orion,* the issue was whether the bankruptcy court could determine, in the context of a hearing under 365(a) to assume an executory contract, whether that executory contract had been breached. Both the bankruptcy and district courts answered this question in the affirmative. The Second Circuit, however, thought otherwise. It silently departed from its recent decision in *In re Sanshoe Worldwide Corp.,* 993 F.2d 300 (2d Cir.1993), holding in *Orion* that such a determination properly should have been made in the context of a separately administered adversary proceeding. 4 F.3d at 1099.

The *Orion* panel explained that the bankruptcy judge does not sit in an adjudicatory function when ruling on motions to assume or reject under § 365(a). Rather, the panel noted, the court sits in a 365(a) hearing much as a business person, as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." 4 F.3d at 1099. Underlying this holding is the premise that "a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate." *Id.* at 1098.

The RTC and the Rockefeller Group assert that *Orion* is on all fours. The argument is sheer nonsense. First off, this case is factually distinguishable from *Orion* because the creditors here, unlike in *Orion,* have each filed a proof of claim. In addition, the issue in the pending adversary proceeding is not whether a breach of contract has occurred. Nor is the issue one of contract interpretation, notwithstanding that the RTC at least may have tried to gussie up its newly-instituted adversary proceeding to look like a

---

**40.** I am not inclined to hold up the Banks' distributions until the enforceability of the contractual subordination provision is resolved in an adversary proceeding, as the RTC desires. An order requiring the debtor either to retain or put into escrow assets to which its creditors are entitled under the plan for the duration of an intercreditor litigation is in effect "an injunction implicating due process concerns." *Weitzman v. Stein,*

897 F.2d 653, 657 (2d Cir.1990). Putting aside the notice requirement issues, the RTC has failed to put forth an argument that without such relief it is likely to suffer irreparable harm. *Id.* at 658. Nor would I be inclined to accept such an argument since the damages the RTC seeks are monetary and the RTC has conceded that "[c]ollection from the banks is not an issue." *See* RTC Trial Mem. at 61.

contract dispute so as to have a shot at arguing that it is not core. No one disputes what the subordination agreements say or even really what they mean. What is disputed is whether there is a debt to which the otherwise subordinated parties can be subordinate. In other words, everyone agrees that if there is a debt, the subordination agreements are enforceable but if there is no debt, then, assuming that the RTC and the Rockefeller Group themselves still have claims (they, too, of course are defendants in the LBO Action), the subordination agreements are not enforceable.

*Orion* is also inapplicable here because a confirmation hearing, unlike a hearing on a motion to assume an executory contract most decidedly is not a proceeding in which a bankruptcy judge sits as a quasi-business person.[41] Without a doubt, this is the type of situation, to which *Orion* adverted, in which the judge sits as an arbiter of disputes between creditors and the estate. As I mentioned above, I am affirmatively required by the Code to find that the each of the standards of 1129 are met before I am able to confirm a plan of reorganization. *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir.1988); *In re Montgomery Court Apartments of Ingham County, Ltd.*, 141 B.R. 324, 329 (Bankr.S.D.Ohio 1992); *Crowthers McCall*, 120 B.R. at 284. This entails the resolution of any and all objections which have been interposed, including ones pertaining to the enforceability of a subordination agreements pursuant to section 510(a).

**E. *11 U.S.C. § 510(a)***

▉ Now that I have established that I have the raw power to consider whether to enforce the contractual subordinations, I next have to consider whether or not to enforce

them. A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another. *In re Kors, Inc.*, 819 F.2d 19, 24 (2d Cir.1987); *In re Lantana Motel,* 124 B.R. 252, 255–56 (Bankr.S.D.Ohio 1990). Section 510(a) of the Bankruptcy Code provides that such subordination agreements are enforceable in bankruptcy to the same extent they are enforceable under applicable non-bankruptcy law. *Kors*, 819 F.2d at 24; *In re Credit Industrial Corp.*, 366 F.2d 402 (2d Cir.1966); *In re Cliff's Ridge Skiing Corp.*, 123 B.R. 753, 764 (Bankr.W.D.Mich.1991); *In re Mihalko,* 87 B.R. 357, 364 (Bankr.E.D.Pa. 1988).

▉ The applicable non-bankruptcy law to which Section 510(a) refers is that of contracts. *In re General Homes Corp.*, 134 B.R. 853, 864 (Bankr.S.D.Tex.1991); *In re Sepco, Inc.*, 36 B.R. 279 (Bankr.D.S.D.1984), *aff'd* in an unpublished disposition, 750 F.2d 51 (8th Cir.1984). Thus, under New York law,[42] when a contractual subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement and the words of that agreement are given their plain, ordinary and usual meaning. *Hong Kong Export Credit, Inc. v. Dun & Bradstreet*, 414 F.Supp. 153, 158 (S.D.N.Y.1975); *Johnson v. Colter,* 251 A.D. 697, 297 N.Y.S. 345 (4th Dep't 1937); *accord In re Envirodyne Industries, Inc.,* 161 B.R. 440, 445 (Bankr.N.D.Ill.1993) (applying New York law). The burden of proving the existence and validity of a contract rests squarely on the party seeking enforcement of that contract. *Kozzom v. Algaze,* —— A.D.2d ——, 610 N.Y.S.2d 227, 228 (1st Dep't 1994); *Lindenbaum v. Royco Property Corp.,* 165 A.D.2d 254, 567 N.Y.S.2d 218, 219 (1st Dep't 1991); *Paz v. Singer Co.,* 151 A.D.2d 234, 542

---

**41.** That the Second Circuit would distinguish the role of the judge in a confirmation hearing from the judge's role in a hearing under section 365 is pretty clear from the Circuit's own discussions about the preclusive effect of each type of ruling. *Cf. Sure–Snap Corp. v. State Street Bank and Trust Co., 948 F.2d 869, 873 (2d Cir.1991) (recognizing that an order confirming a plan of reorganization has full preclusive effect and binds all parties thereto) with Orion, 4 F.3d at 1099 (an order permitting assumption of an executory contract*

is not a formal ruling on the underlying disputed issues vis-a-vis that contract and therefore is not entitled to any collateral estoppel effect).

**42.** The subordination agreement that each of the Objectants as well as the Equitable Group signed provides that New York law governs any dispute which may arise pursuant to that agreement. Debtors' Exhs. 36 at 88, 37 at 15, 55 at 79, 56 at 27 and 60 at 51.

N.Y.S.2d 10, 11 (1st Dep't 1989). Nonetheless, once the burden of showing the existence and validity of a contractual subordination agreement has been met, unless the subordinated creditor can show some inequitable conduct which harmed the junior creditor, such as a subsequent fraudulent transfer or preference, the subordination agreement will be enforced, even if the senior creditor has used its bargaining position, including its refusal to make further loans needed by the debtor, to improve the status of the senior creditor's existing claims. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 609 (2d Cir.), *cert. denied sub nom. Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (Act case).

The policy reasons behind the Bankruptcy Code's recognition and enforcement of contractual subordination agreements were discussed by the Second Circuit in *Credit Industrial* [43]:

A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have explicitly agreed not to accept them ... To deprive lending institutions of the right to enforce lawful subordination agreements and require them to prove in each instance that they relied on such agreements in advancing funds to businesses would not only place in jeopardy literally billions of dollars of outstanding loans, but in all probability would prompt lending institutions to reconsider and possibly curtail their subordinated debt-financing activities to the detriment of the entire business community.

366 F.2d at 410.

█ Best has met its burden of proving the existence and validity of the subordination agreements. None of the Objectants quarreled with this. (Whereas the RTC in one of its memoranda of law pointed to a case in which fraudulent inducement was a defense to attempted contractual subordination, the RTC has never so much as hinted that the banks for which it acts as receiver were fraudulently induced to lend.) Nor have the Objectants adduced evidence which would lead me to conclude that the unambiguous agreements should not be enforced according to their terms. Not that the Objectants haven't had the opportunity. *See* Tr. at 1528–29. They chose to forego proving grounds for equitable subordination (which, as I mentioned much earlier in this decision, they specifically said they were not attempting to show) and instead relied on their jurisdictional arguments.[44]

Best's plan of reorganization does nothing more than enforce the unambiguous terms of the contractual subordination agreements in accordance with section 510(a) of the Code and state law contract principles. Since I have approved a settlement pursuant to which the Banks are left with a claim, the subordination agreements are enforceable.

But even if the LBO Action were not settled, the result regarding subordination would be the same. As I discussed in the section of this opinion on remedies available against the Banks, in the event the LBO were to be deemed fraudulent, the Banks would be left with a substantial claim (although perhaps not as large as the claim being recognized by the settlement). Thus, accepting the Objectants' interpretation of the subordination agreements, a debt would still be due and owing to the Banks under the most favorable litigation scenario from Best's viewpoint, as a result of which the claims of the Objectants would be subordinated to those of the Banks.

---

**43.** Though *Credit Industrial* was decided prior to enactment of the Bankruptcy Code, its continued validity is beyond doubt. Section 510(a) "comports with earlier case law in which the courts enforced such agreements." 3 *Collier*, ¶ 510.03 at 510–5; *In re Holly's, Inc.*, 140 B.R. 643, 669–670 (Bankr.W.D.Mich.1992).

**44.** The Indenture Trustee made no case at all, only asking a short series of questions of one of the other parties' witnesses and putting in no direct case. Because the holders of the 12⅞% notes were offered 103% of face value for the tender of their notes and then repeatedly were offered 100% of face value, it is difficult to swallow the concept that they are entitled to equitable relief.

### F. *Pari Passu Treatment With MetLife*

The RTC contends that it is entitled to receive a pro rata distribution on its claim in an amount equivalent to that received by MetLife on its notes. This is warranted, according to the RTC, since "[a] Letter Agreement" dated September 17, 1990 and signed by Metropolitan Life Insurance Company ("MetLife") requires that the RTC-held notes be "pari passu with the [MetLife] Loans." RTC Post Trial Mem. at 132 (citing Debtors' Exh. 57.) Thus, the RTC concludes, since the plan proposes to pay MetLife a 27.16% distribution, the plan is unconfirmable. This letter agreement was executed by MetLife and Best at the time of the restructuring in 1990. FarWest was not a signatory.

The reply to the argument is that the RTC's claim is being treated in like manner to MetLife's unsecured claim. But by virtue of an enforceable subordination agreement, the distribution on the RTC's claim is being redistributed to senior creditors. Thus, assuming without deciding that the RTC had some right under the agreement between MetLife and Best,[45] that right is not being abridged.

### G. *The Remaining Objections*[46]

 The Objectants urge that the plan does not meet the "best interest" test of section 1129(a)(7) of the Code. To apply this test, courts must consider the value of the debtor's assets in excess of valid liens and exemptions, and determine (using the payment priorities set out in Chapter 7 of the Bankruptcy Code) that each non-accepting claimant or interest holder will receive at least as much under the plan as it would if the debtor's assets were liquidated under Chapter 7 at the date of confirmation. *Montgomery Court*, 141 B.R. at 330.

The Objectants contend that I am unable to apply the test to their claims until a final

value of the LBO Action is determined since, under their theory, the Banks could be denied any claim at all (leaving some of Best's assets for the Objectants). But I have already determined that the predicate for enforcement of the subordination agreements will always exist, so the Banks would have to be paid in full on whatever claim they would be adjudged to hold before the Objectants would receive any distribution. Under these circumstances, the Objectants would have to be the beneficiaries of or achieve what can only be characterized as an astronomical victory in two suits, the LBO Action and the respective suits to escape the consequences of the subordination agreements. I have already explored the vagaries of the litigated route. In addition, the position urged by the RTC and the Rockefeller Group would prevent the confirmation of a plan of reorganization that embodies a compromise of any claim of a debtor that significantly affects the distributions under the plan. It would lead to needless litigation, a waste of judicial resources and a needless depletion of the assets of the debtor's estate. Further, such a result would effectively contravene section 1123(b)(3)(A) of the Code which provides that a plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

 Were the LBO Action not being compromised, I would have to value it for § 1129(a)(7) at what I ascribe to be its settlement value (unless, perhaps, I were to conclude that a chapter 7 trustee would not endorse the same settlement). *See, e.g., In re Texas Extrusion Corp.*, 68 B.R. 712, 719 (N.D.Tex.1986), *aff'd*, 844 F.2d 1142 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988) (Court did not err in determining at confirmation that the debtor's lawsuit had a negligible settlement value for best interest purposes under 1129(a)(7)). Since the LBO Action is being compromised in a settlement which I am

---

**45.** It does not appear plainly from the face of the letter agreement that RTC's predecessor in interest was an intended beneficiary of that agreement. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir.1991).

**46.** I am addressing only those areas in which objections to confirmation were raised. This de-

cision is long enough that to elaborate on what is not contested is nothing short of punishing. Suffice it to say that I have found no reason independent of the arguments of the Objectants to refuse to confirm the plan.

approving, the appropriate value to affix to the LBO Action is the amount of the compromise. As one commentator noted:

> Normally, the parties strive to settle in advance their disputes about whether a particular claim is secured or unsecured and about the respective rankings of different unsecured claims. Those settlements are then embodied in the chapter 11 plan. The question then becomes how the best interest of creditors test should be applied to a chapter 11 plan incorporating those settlements. Once the court determines to approve the settlements, the claims and the values paid to satisfy them may be deleted from the model and the best interest of creditors test may be applied to the balance of the claims and values available.

M. Bienenstock, *Bankruptcy Reorganization* at 617 (1987).

 Here, the best interest test is met, by definition, with respect to thirteen classes of claims (including class 11 for which no ballots were cast) as each of these classes were either unimpaired (and not entitled to vote) or voted unanimously in favor of the plan. Members of classes 13 and 14 have voted against the plan (although the classes as a whole overwhelmingly accepted the plan). In addition, the four classes (classes 15–18) which house the claims of the subordinated creditors as well as the three classes of interest (classes 19–21) are deemed to reject the plan as they are receiving no distribution. 11 U.S.C. § 1126(g). For the plan to be confirmable, each non-accepting claimant or interest holder in classes 13 through 21 must receive at least as much under the plan as it would if the debtor's assets were liquidated under Chapter 7 at the date of confirmation.

The value of the reorganized company (inclusive of the value of the LBO settlements which range in the vicinity of $44 million), is approximately $625 million. *See U.S. v. Neal Pharmacal Co.,* 789 F.2d 1283, 1289 n. 13 (8th Cir.1986) (section 1129(a)(7)'s best interest test requires that the present value of a debtor's assets be determined as of the effective date of the plan). Best estimates that the company's liquidation value would be roughly $511 million, of which $148.5 million would flow to unsecured claimants. Debtors' Exh. 175 at E–2. Best also estimates that the subordination agreements would be enforced and that $1.1 billion in unsecured claims would share in the $148.5 million pot. From this Best extrapolates that the four classes of subordinated creditors as well as the three classes of equityholders would receive no distribution and that classes 13 and 14 would receive a 14.6% and 13.0% distribution, respectively. These liquidation values appear reasonable, especially in light of the fact that no evidence has been put forth in opposition to Best's estimates.

Under the circumstances, I find the best interest test is met with respect to classes 15 through 21 as each of these would receive no distribution under either the proposed plan or in the context of a liquidation. Similarly, the figures establish that the claimants in classes 13 and 14 who voted against the plan will receive 47% under the proposed Chapter 11 plan and 14.6% and 13.0%, respectively, if Best were liquidated in Chapter 7. Debtors' Exh. 175 at E–3. Thus the best interest test is met as to classes 13 and 14 as well.

 The remaining issue is whether the plan was proposed in good faith. The Objectants urge that the plan is not filed in good faith because the LBO settlement which is the cornerstone of the plan is allegedly a sham. *See* Obj. of First Fidelity Bank at 3. The Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. 1129(a)(3). "Good faith" is not defined in the Bankruptcy Code. What courts generally consider is whether "there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re Texaco, Inc.,* 84 B.R. 893, 907 (Bankr. S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988) (citations and quotations omitted). In making this determination, courts look to whether a Plan was Proposed with "honesty and good intentions" and with "a basis for expecting that a reorganization can be effected." *In re Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988).

Aside from First Fidelity Bank's bald assertions, no evidence has been presented

which leads me to believe that this plan was proposed or negotiated in bad faith. Essentially I have gone through this analysis in order to approve the settlement. As I concluded there, the settlement value is substantial and the settlement was negotiated in good faith. The disclosure statement which explained the settlement was a hotly contested document as originally drafted and went through numerous revisions, not because I concluded that there was some bad faith involved, as the Indenture Trustee for the 12⅝% notes suggests, but because I wanted to be certain that the reasons for the settlement and the opposition to it by the subordinated creditors were fully laid out for the creditors. Given the depth of analysis in the disclosure statement, there can be no doubt that the creditors were armed with the necessary information to assess the desirability of voting for or against the plan. Moreover, as my analysis of the reasonableness of the settlement suggests, Best had a justifiable expectation in promulgating the plan that it could be confirmed.

## CONCLUSION

The settlement of the LBO Action is approved and the plan may be confirmed. In addition, the uncontested settlements with Mutual Life Insurance Company of New York and Principal Mutual Life Insurance Company are approved. SETTLE ORDER consistent with this decision.